RALPH REXROAT, APPELLANT, V. STATE OF NEBRASKA ET AL., APPELLEES.

7 N. W. (2d) 163

FILED DECEMBER 23, 1942. No. 31496.

598

W. G. *Ashford* and *Mark J. Ryan*, for appellant.

*Walter R. Johnson, Attorney General*, and *Herbert T. White, contra*.

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

MESSMORE, J.

This is a workmen's compensation case. It is not disputed that the claimant (appellant), a common laborer, aged 39 years, on February 26, 1932, an employee of the department of roads and irrigation of the state of Nebraska, was working on highway No. 20, about a mile and a half west of South Sioux City, Nebraska, with a road grader, to be pulled behind a tractor, and in endeavoring to hitch the grader to a five-ton caterpillar tractor, the tractor backed over the appellant's right foot and right leg. The accident arose out of and in the course of appellant's employment, as provided in section 48-101, Comp. St. 1929.

The original action was commenced November 2, 1934, before the compensation commissioner, and on March 4, 1935, the cause was heard. On March 20, 1935, an award was rendered by the commission in favor of the appellant, granting him compensation at the rate of $10.50 per week for the first 300 weeks and $7.09 per week thereafter for the remainder of appellant's life, for a 75 per cent. permanent partial loss of the use of his right arm and right leg. The appellee paid compensation in conformity with this award from February 27, 1932, to Febuary 22, 1940, in-

clusive, when appellee ceased to pay such compensation. The instant case has been tried, submitted and briefed as an original compensation case.

The appellee did not file an application under section 48-142, Comp. St. 1929, on the ground of decrease of incapacity, due solely to the injury, but stopped the payment of compensation. The pleading on appellant's behalf does not attack the procedure in the instant case, but treats the case as an original compensation case.

The transcript reflects the following for the purposes of this action, that an award was made by a judge of the compensation court, filed May 6, 1941, setting forth the appellant's injury occurring in the course of his employment, and finding and decreeing that the plaintiff was temporarily totally disabled from and after February 26, 1932, to and including the 22d day of February, 1933, constituting a period of 51 5/7 weeks, at which time all temporary total disability terminated and ceased, and said temporary total disability was followed immediately by 75 per cent. permanent partial disability of the right leg, and 75 per cent. permanent partial disability of the right arm for a period of 248 2/7 weeks, and thereafter 75 per cent. permanent partial disability for the remainder of appellant's life; that at the time of said accidental injuries, appellant's wages were $21 each week, sufficient to entitle him to compensation at the rate of $14 each week for a period of 51 5/7 weeks for temporary total disability, and compensation at the rate of $10.50 per week for a period of 248 2/7 weeks for disability as hereinbefore set out, and $7.09 per week for the remainder of appellant's life; that the appellant has received compensation in the amount of $4,160.53 for which the appellee should have credit. The hospital expenses and medical fees paid were enumerated. The credit to appellee as designated in the award is $724, as against compensation of $14 per week for 51 5/7 weeks from and after February 26, 1932, to and including February 22, 1933; $2,607 to be credited in amounts paid for permanent partial disability from and after February 22, 1933, 248 2/7 weeks, and

$829.53 credited on the amount of $7.09 each week thereafter to the date of the award, as compensation payable during the appellant's lifetime. A waiver of rehearing before the compensation commission and an election to appeal directly to the district court from such award were filed.

The petition on appeal from the compensation court filed in the district court May 19, 1941, set out, in substance, the history of the proceedings, alleging that the court "acted without and in excess of its powers;" the findings of fact are not sustained by the evidence, and the disability under which the appellant labors is not due to the injuries which he sustained, but due to his own failure or unwillingness to allow a normal recovery, and that, had the appellant made any effort on his part to restore the injured member to service, his disability at this time would be negligible.

An answer was filed on May 29, 1941, and an amended and substituted answer on December 1, 1941, by leave of court obtained, in which the appellant admits the exhibits attached to the petition are true and correct copies of the originals filed in the workmen's compensation court; denies that the court acted without and in excess of its powers, and that the findings of fact as set forth are not supported by the record and do not support the order and award; denies that the disability suffered is in any way due to any fault or unwillingness on his part to allow normal recovery, and that he has made a diligent effort to restore the injured member to service, but despite his efforts his disability continues and is a direct result of the injury sustained by him for which the award was made; alleges that since February 26, 1932, appellant has been totally disabled and should be paid compensation on the basis of total disability; alleges that he did not appeal from the original award allowing him but 75 per cent. permanent partial disability for the reason that he believed he would eventually regain the use of his limbs, and that by reason of the permanent total disability he is unable to earn a livelihood, and is entitled to receive compensation at the rate of $14 a week for the remainder of his life, and is therefore en-

titled to the difference between $10.50 a week, as set forth in the award, and $7.09 permanent disability as set forth therein, and prays for recovery in such amount.

The district court entered judgment June 9, 1942, in substance as follows: Setting forth that the appellant was injured in the course of his employment on February 26, 1932; that he sustained an injury to his right foot and right leg, with the result that the fifth metatarsal bone of appellant's right foot was broken and he sustained a soft tissue injury to his right leg; that the appellant was hospitalized for his injuries directly after the accident and made a normal physical recovery from the direct effect of the injury sustained; that there was some atrophy of appellant's lower extremities and at the time of trial of this cause the appellant was suffering disability, preventing him from engaging in manual labor, which was the means by which he earned his livelihood prior to the accident. The court found from the evidence, however, that appellant at the proper time in the course of his recovery from his injuries was advised to abandon the use of his crutch and to use his right leg; that from September 9, 1937, up to and including the date of trial, the appellant had no organic physical or neurological disability, and that he has never suffered sufficient physical or anatomical injury to account for permanent disability or the disability of which he complains, and the court found from a preponderance of the evidence that appellant's present disability is due to the disuse of his upper right and lower right extremities, and that the failure on his part "to use his right arm and right leg whether caused by hysteria or conscious failure is the efficient intervening cause of the whole of the disability" of which he now complains; that the disability of which appellant complains, "whether continued or produced by hysteria or conscious acts or failure, cannot be considered as the result of 'violence to the physical structure of the body,' or such 'disease or infection as naturally results therefrom,' " and that such disability is not compensable under the workmen's compensation act, and that the ap-

pellant has been fully compensated in the payment of compensation to him in the amount of $4,160.53, and medical expenses incurred, which have been paid. Appellant's petition was dismissed. Motion for a new trial was filed, submitted and overruled, and the cause was appealed to this court, the appellant contending that the finding and judgment of the trial court is not sustained by sufficient evidence, is contrary thereto, and contrary to law, citing section 48-101, Comp. St. 1929.

The evidence of the medical experts as to appellant's disability, the extent thereof, and the physical examinations of the appellant with respect thereto are, in substance, reflected by the record as follows:

Immediately after the accident the appellant was removed by a stock truck to Doctor Legg's office in South Sioux City. The doctor was not in, and the appellant was taken in an ambulance to the Methodist Hospital where he was treated by the doctor. Thirty stitches were taken in the foot and leg, and the leg was treated with wet dressings and was not put in a cast. One bone was broken, the fifth metatarsal, just below the little toe. The patient remained in the hospital 39 days and bandages were kept on his leg for a period of three months, at the end of which period they were removed by the doctor's orders. He was subsequently treated by Doctor Legg for four years. He made several calls to the doctor's office, appellant designating the number of calls as 30.

Dr. C. E. Legg testified: The appellant had "a contused laceration extending from just below the knee to near the ankle, over the crest of the tibia. It was laid open. X-rays showed no broken bones except in the foot. There was a broken metatarsal bone." The doctor saw the plaintiff practically every day while he was in the hospital and continued to see him every day for a short time at the office, and then two or three times a week until 1934. In answer to the question: "What sort of treatment did you give him at the office?" the witness answered: "When he first came from the hospital there was a slight skin wound; that was

healed by granulation and then later on I gave him vibratory treatments to tone up the muscles of that limb." The doctor saw the patient frequently after 1934, sometimes once or twice a month or twice or three times a year. He testified that the limb "apparently never did regain its normal function," and the patient was unable to get along without a crutch; "he complained of it being cold and when he attempted to step on it he claimed there was pain there;" that he had never been able to resume his employment; that the "measurements of his limb compared with the well limb" and his physical condition showed the limb to be smaller; the doctor examined him two days before the trial. The witness stated the patient claimed that his right limb would not "bear his weight. He has perfect use of it so far as motion is concerned, but when he commences to step on it it pains him and it seems to be weaker than normally." He testified that the temperature of the leg was cooler "on the injured side than on the well side;" that in his opinion the appellant "will never be able to do manual labor or resume his normal duties as he did before;" that he advised the patient to use the leg as much as possible and to do without a crutch, which had been furnished him, in order to rehabilitate the leg; that the continued use of the crutch developed "crutch palsy." According to the various reports made by the doctor when he fixed the time of the appellant's recovery, as he proceeded along with the case, the time was always extended, appellant failing to respond to treatment. The doctor testified on cross-examination that during the four years he treated the patient he urged him to walk without the crutch, gave him other examinations; his reflexes disclosed no nerve injury, permanent muscular injury or bone injury; the fifth metatarsal bone healed promptly; "owing to the limited nutrition of the cord over the crest of the tibia, which is always rather poorly supplied with blood vessels, that was slow in healing, but that was the only reason for that." The doctor discovered no reason why the patient suffered pain when he tried to walk. He failed to find from an ex-

amination of the ball of the foot "any callous or evidence of much use on the bottom" of the foot, which would indicate that the patient either had not used or could not use the foot. During the period of two years or more of such treatment the doctor advised with the patient about attempting to use his foot, and the patient reported that he would try; he attempted to use it while in the doctor's office, but was unable to do so, and would complain of pain when he would take a step. The doctor's opinion, in accounting for the disability, was that it was probably more or less psychic, or mental; that the patient made an honest effort to use his leg and complied with instructions.

Dr. R. T. Rohwer made an examination of the appellant October 4, 1941. He observed the patient generally in his walking; paid particular attention to the use of the arms, legs, hands and feet, the range of motion, the various joints of the members, the texture of the skin, the tone and volume or size of the muscles, and made investigation of the nerve function of the members. The examination revealed a suggestion "of limitation in the movement of the arm, probably flexion in the elbow." On an examination of the right ankle there appeared to be a limitation which is described as "dorsoflexion of the ankle," and when an attempt was made to forcibly flex the foot, the limitation persisted and caused some pain in the calf muscles of the leg. There was atrophy in all the muscles "of the thigh and over the hip, the gluteal muscles were definitely smaller than on the other leg;" diminution in the size of the calf muscles, and the doctor gave the measurements. He stated the patient was unable to walk without a crutch. His opinion was that the functioning of the patient's right upper and lower extremities was impaired, which could not be "directly attributed to any basic or gross organic lesion," as evidenced by the weakness and atrophy and limitation of motion; that "there was a physical basis for this disuse which was probably the disuse resulting originally from fear of pain and aggravating his condition, and that the functioning was probably further impaired by his mental

attitude toward his condition." In the doctor's opinion he was suffering from a definite psychoneurosis, which evolved from the accident and injury. From the fact that the patient's condition is of about nine years' standing, the doctor gave an opinion as to the adequateness of the treatment given him at the time of the injury and the completeness thereof. The doctor testified that "from a physical standpoint the extremity as such was adequately taken care of at the time, however, after the wounds were healed, dressings removed and with a lapse of time, there ceased to be the expected improvement and response. * * * Probably the treatment then should have been continued until such time that the man would have been completely rehabilitated, which was not done. * * * It may not have been recognized at the time the nature of the functioning of the psychiatric program;" that, in his opinion, the appellant is "totally disabled and, until proved otherwise, that he is permanently disabled;" that his condition is attributable to the injury he received February 26, 1932. The doctor's next impression was that he attributed lack of use of appellant's limb to his fear of the injury, rather than to anything else. On cross-examination the witness testified: "He (appellant) was able to apply the foot to the normal range of motion, with the exception of this limited dorso-flexion. However, he was not able to use the foot to bear weight on it, he did not stand on the foot bearing weight on it to any reasonable degree. * * * Ordinarily the fracture of the metatarsal as such and the soft tissue injury that he had sustained, the disability would be of a limited duration." In answer to the question: "From your examination wouldn't you say that Mr. Rexroat's present condition is entirely due to his mental condition?" the witness said: "No, I will put it this way, that his mental condition definitely has not permitted him to go ahead and use his arm and leg. Q. That disability that Mr. Rexroat has now, Doctor, in his right leg and right arm, is almost entirely due to nonuse of them? A. Yes, I will grant that. * * * Q. Do you consider this condition that Mr. Rexroat now has what is

called hysteria? A. We might term it hysteria. * * * Q. A mental condition entirely? * * * A. He is definitely convinced, very honestly convinced, that he is suffering from disuse and also pain. His symptoms are real. He experiences pain and weakness. * * * Q. Isn't pain that is registered in his mind mental pain? A. Frankly, some is and he may have a hyperesthesia. He is more sensitive to injury. I do believe that his atrophic arm with vasomotor disturbance and with muscular spasm such as occurs in the calf of the leg would produce physical pain." On further cross-examination the doctor testified: "Q. And malingering is simply a desire on the part of an injured person or a person who has been sick not to have a recovery, that is, not to have a physical recovery, does that about describe a malingerer? A. That is essentially it. The malingerer intentionally or consciously seeks disability, usually for monetary gain or sympathy, or probably to cover up failure in life in other respects. * * * Q. Hysteria differs from malingering only in this degree, that in hysteria the patient has built up within his mind a condition that he himself honestly believes that he is unable to move about and perform his normal functions, isn't that about the only difference between hysteria and malingering? A. In hysteria it is not conscious, it is an unconscious affair, although the mechanism of the development of the particular mental state is probably different." With reference to appellant, the doctor stated: "It was my feeling and belief that he developed this particular mental state because of fear and lack of understanding, ignorance as to what happened and how he got that way and what he must do in order to get well—that is early in his disability. I don't believe he has an understanding of why he is as he is." The witness said that the disability in the arm could come from the use of the crutch after the patient was discharged from the hospital. The doctor was asked if he had an opinion as to whether or not appellant is a malingerer, and he answered: "A. It was my opinion that he was suffering from a psychoneurosis of an hysteric nature and that he was not a

malingerer." The doctor believed that "this man actually suffers pain. It is registered on his central nervous system as pain."

Dr. S. D. Carney examined appellant September 10, 1941. He testified the patient complained of pain in his right arm and that his leg became cold, that "when he laid his right arm on the table or chair arm, that the arm became cold, that he lost feeling in the arm, and complained of a constant ache in the leg." The doctor testified to the difference in measurements of the injured portions as compared with the well portions and on examination of the leg, he stated, "the leg seemed to be smaller than the left leg. It was discolored looking like a case of eczema. The skin was scaley from the knee to the ankle. There was a scar showed on it over the crest of the tibia. This scar was not attached to the tissue, but was freely movable. The X-ray showed a fracture of the fifth metatarsal bone. The leg was colder to the touch, noticeably colder when you put your hand on it, and measurement showed it to be smaller." The witness further testified that the left arm was atrophied and scaley, had the appearance of eczema; that his reflexes were all normal; "the motions of the arm and leg were all present, but he did not have the strength in these muscles;" he could "pick up a small object and do it with precision;" there was no evidence of paralysis or nerve destruction; use of muscles was normal. The witness was asked: "Do you have any opinion, Doctor, as to whether Mr. Rexroat's not using that arm and leg are due to fear of pain in it if he does use it, or whether it is due to some mental quirk? A. Of course he told me that he could not use it because it hurt him, but after examining the man carefully I could not find any reason why there should be pains. And it is my opinion that he didn't use it because he didn't want to." On cross-examination, the witness placed the percentage of disability of the right arm and right leg at 75 per cent.

Dr. A. C. Bennett examined appellant December 17, 1941, gave him general physical neurologic and psychiatric ex-

aminations. The doctor found no physical disabling condition. He detailed method of the neurologic examination, and to explain a generalized functional motor weakness, the doctor said: "Well, one of two things are responsible for that, either the patient's mental attitude that those muscles were weak and therefore he didn't use them, or perhaps prolonged disuse of the arm would produce a functional loss of strength there, but not the result of anatomical disease of nerves or muscles." The witness further testified: "When the patient was asked to stand with both feet together he insisted upon using a crutch; contended that he couldn't raise up on his toes or back on his heels, and in studying his gait he wanted to demonstrate using a crutch, keeping his right foot semi-abducted, that is, turned out. When asked to walk without the crutch, would hop on the left foot and drag the right foot along and scrape it on the floor, yet there was good motor power throughout the examination, showing that this was a functional state of disability. The patient's excuse for it was that he had too much pain in his right foot and leg to allow him to bear his weight on this member." The witness was asked: "From your examination of him, Doctor, do you have any opinion as to whether the patient's mental condition causes or contributes to his present condition? * * * A. It is my opinion that the whole thing is based on his mental attitude toward his disability, and that he has no basic neurological anatomical disease whatsoever." The doctor further said that exercise of the patient's right arm and leg would result in improvement, but there would have to be mental cooperation to obtain the desired effect; that the doctor's physical, neurological and psychiatric examination of the patient produced no evidence of any physical organic trouble caused by the accident to his leg which would account for the disability. When asked, "Do you have any opinion, Doctor, as to what effect Mr. Rexroat's present mental attitude has with relation to creating a condition of permanent disability?" the witness replied: "Well, the present mental attitude that he has, unless it is

changed, you would consider him disabled, but it is a correctable attitude. He should have a recoverable condition state of mind, because it is purely a state of mind. It is possible to change his mental attitude under appropriate treatment." The doctor testified that the patient's condition was psychoneurosis of more than nine years' standing; that the patient "got off on the wrong foot" early in his treatment experience with an abnormal mental attitude toward himself. "Q. You used the word 'malingering' here, Doctor. Do you want to be understood as being of the opinion that this man is a malingerer? A. No, I said it raises the question when the patient is too antagonistic toward any efforts of proper aid or help toward recovery, and I said it is very difficult at times to distinguish between that that is conscious malingering and the hysterical individual who unconsciously malingers, and in this individual I feel that the weight of evidence is in favor of being hysterically subconscious of illness. * * * Q. Wouldn't the present condition of this patient more likely be the result of improper treatment or lack of proper treatment at the time of the injury than the mental condition at the present time? A. I would like to qualify it by saying about the treatment, I would not say that it was improper, but it didn't go far enough. It was not adequate in that it didn't take into consideration his personality, make-up and things like that. It probably was not recognized on the part of his doctors the importance of the nerve element in the picture, or something of that sort. I saw nothing in the history to indicate that he did not have proper treatment, but he never has had any treatment directed toward the mental disability. * * * Q. From your psychiatric examination, Doctor, I take it that you formed the opinion that the patient is firmly convinced that he has a permanent disability? A. That is the impression he gave me, yes."

Dr. J. W. Duncan examined appellant September 1, 1937, and in November, 1938. From his examination it was his opinion that the patient had suffered "a soft tissue injury more than five years previously;" that the wound healed

and that the patient's statements were in many cases evasive and contradictory; that any disability he had to the right upper extremity "could have been due to a crutch palsy," which comes only if the crutch bears firmly in the armpit and makes pressure on the nerves; that there was no disability to the right upper extremity except from disuse of the muscles; that he believed the patient did not need a crutch at the time he saw him; that there was no cause for the ache in his shoulders; that in his right lower extremity he sustained "a soft tissue injury, which healed completely without any disturbance of circulation and without any limitation of movement in any of the joints of that extremity." The doctor did not believe that the patient had any organic disability in that extremity at the time he examined him, and thought that the atrophy he showed "was due to disuse and the use of the crutch." The same conclusion was reached on the second examination. The purpose of the examination was to advise the compensation court of appellant's disability due to injury, if any. The doctor was a member of the medical advisory board of the workmen's compensation court at that time. He testified on cross-examination that he was led to believe on the second examination that the patient was malingering; that it is difficult to distinguish between hysteria and malingering; that on the second examination the doctor felt that appellant "knew pretty well that if he used his arm and his leg he would get well;" the witness thought it advisable to have the patient examined by a neuropsychiatrix, and his opinion as to whether or not the patient was malingering would be more or nearly correct. On further cross-examination, the witness was asked: "Regardless of whether Rexroat is suffering from hysteria or whether he is malingering he is at this time definitely disabled from earning a livelihood and will be until he is rehabilitated, and that was his condition at the time of your examination? A. I think he was disabled at the time I examined him from muscular weakness and atrophy from disuse, whether it was from malingering or whether from hysteria. Q. And you don't pretend to say which it was definitely? A. No, I do not."

Dr. J. W. McNamara, a member of the advisory board of the workmen's compensation court, examined appellant November 15, 1938, when Doctors Duncan and Fouts were present. He testified that this examination coincided with that made by Doctor Duncan, and in all respects was practically the same.

We deem it advisable to quote further from the testimony of Doctor Legg, the only attending physician of appellant: "Q. Doctor, would it be possible for a man to have a leg in the condition that plaintiff's is without a crushing injury to start with? A. No, I don't think so. Q. Mere disuse alone wouldn't produce such condition? A. No. * * * Q. What is the fact, Doctor, was the crushing injury to the soft tissue of the leg much more severe than a fracture of the metatarsal bone? A. Well, at that time I didn't think that the crushing was to the extent that it would cause him permanent disability, that it would absorb. There didn't appear to be much crushing underneath. It was in the top of the muscle, not underneath where it was crushed." In all the doctor's reports, he answered the question, "Has injured person obeyed orders in regard to treatment?" with "Yes." The witness felt that there was some nerve injury, but his testimony on this point is conflicting and contradictory. Quoting further: "Now, Doctor, you are more familiar with this case than any other of these doctors that testified. What is your candid opinion, is the plaintiff malingering or sincere in his disability? A. I believe he is sincere." On recross-examination: "Q. Doctor, in your report to the Compensation Court on April 22, 1940, you used this language, 'The only conclusion that I can come to is that this man's disability is self-imposed. He is either a malingerer or has developed a mental attitude that prevents him from honestly appraising his own condition. His disability would long since have ceased had the patient made the necessary effort to get the leg back in service.' A. Yes, I made that statement and I thought at that time that it was true. Now the question is whether it is mental. He is not malingering I am satisfied of that. Whether it

is mental or whether there is an injury there that they were unable to determine is more than I can answer because I don't know that. I judged only by the appearance of the muscles at the time of the injury, the amount of hemorrhage, etc. Now ordinarily it should have recovered long since, but whether there was a deeper seated injury than I was able to determine, I can't say. Dr. Bennett may be right so far as the mental part is concerned." The witness stated: "After I read Dr. Bennett's report, and that was what caused me to change. It is either that he was injured—the injury was deeper seated than I at first suspected or as Dr. Bennett says, it is a mental injury. After reading his report it strikes me that he went into it very thoroughly from a psychiatric standpoint and he is a better judge of psychopathy than I am because he makes that his business. * * * Q. He is either a malingerer or he has developed a mental attitude which prevents him from honestly appraising his own condition? A. Yes, sir."

Appellant was asked on cross-examination: "You would be unwilling to undergo treatment by a psychiatrist? A. Yes, I think it would be just foolish." On redirect examination appellant was asked: "I want to ask you this question, if the Court should direct or request you to submit yourself to any competent psychiatrist or other physician for additional treatment with a view of rehabilitating yourself, are you willing to submit to such treatment as the Court should direct? A. I will do anything I can to help use my leg." He testified he used his leg by exercise and followed the direction and advice of his physician. The foregoing constitutes the material testimony upon which the court based its decree, dismissing the appellant's petition.

It seems that the expert medical testimony is undisputed that there is no physical or nervous bar to plaintiff using the injured leg. However, the evidence is far from proving with reasonable certainty that the appellant is a malingerer. Appellee's witness, Doctor Bennett, testified to the contrary; Doctors Duncan and McNamara in their testimony did not go so far as to charge the appellant with

being a malingerer. Doctor Duncan thought appellant's condition might be due to hysteria or malingering and would not say definitely. Doctor McNamara did not consider himself qualified to give an opinion on the subject, and stated that the opinion of a psychiatrist would be more valuable than his would be. Doctor Legg, the attending physician, stated that the appellant is not malingering; he was satisfied of that. Doctor Carney, who examined the patient once, nine years after the injury, stated that in his opinion appellant was a malingerer. Doctor Bennett testified that the treatment did not go far enough; that it failed to take into consideration the "importance of the nerve element in the picture," the patient's personality, make-up and other elements heretofore set out. He further stated that the history of the case clearly indicated that the patient should have had psychiatric treatment. Doctor Rohwer's testimony is that after a long period of time appellant was still going to the doctor's office and still taking treatments. If he has developed psychoneurosis, Doctors Bennett and Rohwer agree that it is directly attributable to the accident; that is the fact or else, as Doctor Legg testified: "There is an injury there that we are unable to determine."

The appellant has submitted himself to all of the treatment offered him and to every examination requested by his employer. He followed Doctor Legg's instructions and advice. Three eminent physicians have twice examined him, and two others have examined him once, not one of whom has given any specific advice or prescribed any course of treatment. There has been no change in the appellant's condition since March 12, 1935.

From an analysis of the expert testimony, it is quite apparent that the treatment given by Doctor Legg was not adequate. It would seem that when the appellant failed to respond to treatment and was developing a mental condition, as testified to by the experts, treatment in this field should have been given, the objective being to rehabilitate the appellant, whether he was suffering physically or men-

tally. The conclusion is that he developed an attitude with reference to his injury that had all of the elements of physical pain, and this he endured throughout the period of time for which compensation was paid, and up to the present time. It is our firm belief that the treatment should not have ended.

The important issue in this case, contended for by the appellant, is whether disability under which appellant labors at the present time is due to hysteria directly attributable to the accident, or to conscious failure to allow a normal recovery, or whether it was a deep-seated and more serious injury than was apparent to the doctor in charge of the case. This question has not been passed upon.

The appellee cites numerous cases to the effect that disability chargeable against an employer is only that resulting from accident incurred in employment and not that caused by a workman's carelessness, preventing or delaying recovery. If an employee, suing for compensation under the workmen's compensation act, by his own conduct, inactivity and neglect after an injury, suffers a member of his body to become useless, when with proper effort on his part, without unusual pain or suffering, it could have been restored, he cannot recover compensation.

We have carefully considered the cases cited by the appellee and conclude that the factual situation in each of them is distinctively different than in the case at bar, and the rules of law therein announced are not applicable to the instant case, and under the circumstances presented herein.

As previously stated, the appellee stopped payment of compensation to appellant. At or subsequent to this time, the appellee did not file an application on the ground of decrease of incapacity, as provided for by section 48-142, Comp. St. 1929, as amended; hence, this original compensation action.

The petition on appeal from the compensation court alleges that the disability under which the appellant labors is not due to the injuries which he sustained, but due to his own failure or unwillingness to allow normal recovery;

that had the appellant made any effort to restore the injured member to service his disability at this time would be negligible. This allegation constitutes the charge of negligence against the appellant.

Section 48-102, Comp. St. 1929, provides: "In all cases brought under Part I of this article (48-101 to 48-108) it shall not be a defense (a) that the employee was negligent, unless and except it shall also appear that such negligence was wilful," etc.

Section 48-107, Comp. St. 1929, provides: "In all actions at law brought pursuant to Part I of this article (48-101 to 48-108) the burden of proof to establish wilful negligence of the injured employee shall be on the defendant." The two foregoing sections place the burden of proof of establishing negligence in a compensation action on the parties pleading such negligence. Ordinarily, the employer endeavors to show that the employee is a malingerer. The term is defined in *Great Western Sugar Co. v. Hewitt*, 127 Neb. 790, 257 N. W. 61, as follows:

"Malingering, as applied to compensation cases, may be defined as a deception, practiced by a dishonest employee, by feigning, inducing, or prolonging either sickness or injury, for the purpose of securing illegal or fraudulent payments therefor under the workmen's compensation law."

Applying the above definition to the facts and circumstances in the instant case, the evidence falls short of establishing with reasonable certainty that the appellant is a malingerer. Further, the evidence is insufficient to show wilful negligence on the part of the appellant as charged by the appellee. The award was originally made on March 20, 1935, and amounts paid, as heretofore set out, to February 22, 1940. The benefits were accepted by appellant, with no appeal respecting such amounts until the present action wherein he asks for additional compensation, in that the former compensation was not accurately computed. The compensation judge in the instant case set forth the judgment as shown which increased or changed the amount of compensation from the original judgment, this in pur-

suance of his analysis of the appellant's compensation due him under section 48-121, Comp. St. 1929; that is, the appellant suffered temporary total disability from and after the injury for 51 5/7 weeks, which would entitle him, under the current wage of $21 each week, to the amount of $14 per week, and the sum of $10.50 per week for a period of 248 2/7 weeks, where temporary total disability is followed by permanent partial disability. This disability was 75 per cent. for loss of the use of his right leg and right arm. This constituted the compensation allowance for the first 300 weeks; subsequent thereto the allowance of $7.09 each week thereafter for life, based on partial permanent disability then suffered by the appellant. This latter award is in keeping with the evidence with respect to the disability suffered by the appellant, and it was through no fault of the appellant that after a period of eight years the employer suddenly stopped payment of all disability. This action, constituting an original compensation action, again determines the amounts to be paid as compensation and the disability suffered by the appellant. The appellee sought to deprive the appellant of further compensation and force him to again prove the extent of his disability and the amount he would be entitled to recover for the same, and attacked that right by the affirmative allegation, as hereinbefore set out, in the petition on appeal.

We conclude, under the circumstances, that the appellant is entitled to the award as made by the compensation commissioner in the instant case. The cause is reversed and remanded, with instructions to enter judgment accordingly, with full credit to be given the appellee for the amounts paid.

REVERSED.