No. 40,144

CHARLES C. BARR, *Appellee,* v. BUILDERS, INC., and HAWKEYE-SECURITY INSURANCE COMPANY, *Appellants.*

(296 P. 2d 1106)

Opinion filed May 5, 1956.

Byron Brainerd, of Wichita, argued the cause, and Claude I. Depew, Lawrence Weigand, Lawrence Curfman, Charles W. Harris, Orval J. Kaufman, J. Ruse McCarthy, Thomas A. Wood, and Donald A. Bell, all of Wichita, were with him on the briefs for the appellants.

Ralph B. Foster, of Wichita, argued the cause, and Sidney L. Foulston, Jr., Lloyd F. Cooper, W. Jay Esco and Dale H. Cooper, all of Wichita, were with him on the briefs for the appellee.

The opinion of the court was delivered by

FATZER, J.: This is a workmen's compensation case where the commissioner rendered an award in favor of the claimant, which was affirmed by the district court, and an appeal has been taken from that judgment by Builders, Inc., and its insurance carrier.

The appellant has made four specifications of error, which are briefed under one general heading, i. e., whether there was substantial evidence introduced before the examiner and affirmed by the trial court, upon which to base claimant's award. Both parties agree this is the only point in the appeal. Most of the usual preliminary features of a compensation case such as employment, being under the Act, notice of alleged accident, demand for compensation, and amount of wages are not controverted. No point is urged as to the fact of claimant's accident, which occurred July 20, 1954, or about his actual disability, so, the serious question presented is the sufficiency of the evidence of causal connection between the accident and the disability.

Specifically, appellant contends the expert testimony, which diagnosed claimant's disability as conversion hysteria, was highly speculative and conjectural and could not form the basis of an award, since one of the factors which might have produced the disability, i. e., the financial difficulty claimant experienced in August, 1954, was not considered in forming the opinion, and further, that such testimony was indefinite with respect to traumatic relationship between the injury and the disability.

Omitting portions relating to compensation and expenses found to be due under the Workmen's Compensation Act, the all decisive finding made by the commissioner in making his award, which was

substantially adopted and approved by the trial court in rendering its judgment, in part, reads:

"It is found, in addition to the stipulations, that claimant was injured by accident arising out of and in the course of his employment with the respondent on July 20, 1954, from which claimant suffered temporary total disability commencing August 21, 1954. . . ."

As preliminary, we point out that under G. S. 1955 Supp. 44-556, appellate jurisdiction in compensation cases is confined to reviewing questions of law only. In so doing, it is necessary to determine whether the record contains substantial evidence which tends to support the trial court's factual findings, and this court is required to review all the evidence in the light most favorable to the prevailing party below. Under the rule established by the decisions of this court, such findings are conclusive and will not be disturbed on review even though the record discloses some evidence which might warrant the trial court making a finding to the contrary. (*Andrews v. Bechtel Construction Co.*, 175 Kan. 885, 267 P. 2d 469; *Silvers v. Wakefield,* 176 Kan. 259, 270 P. 2d 259; *McDonald v. Rader,* 177 Kan. 249, 277 P. 2d 652; *Evans v. Board of Education of Hays,* 178 Kan. 275, 284 P. 2d 1068; and, *Shobe v. Tobin Construction Co.*, 179 Kan. 43, 292 P. 2d 729.) Numerous decisions of like import will be found in 9 West's Kansas Digest, Workmen's Compensation, §§ 1940-1969, and 5 Hatcher's Kansas Digest (Rev. Ed.) Workmen's Compensation, § 153.

In giving the announced rule effect, we inquire: What is substantial evidence? In *In re Estate of Harris,* 166 Kan. 368, 372, 373, 201 P. 2d 1062, it was stated it must appear from the record that the trial court's findings are based upon facts which substantiate them, otherwise they do not rise to the dignity of "substantial evidence." The term "substantial evidence," when applied by this court in reviewing an award under the Workmen's Compensation Act, means evidence possessing something of substance and relevant consequence and carrying with it fitness to induce conviction that the award is proper, or furnishing substantial basis of fact from which issue tendered can be reasonably resolved.

We turn to another rule established by this court in a long line of decisions applicable to workmen's compensation cases, which is that our workmen's compensation statute is to be liberally construed with a view of making effective the legislature's intent and not for the purpose of nullifying it. (*Mendel v. Fort Scott Hydraulic Ce-*

*ment Co.*, 147 Kan. 719, 78 P. 2d 868; *Hilyard v. Lohmann-Johnson Drilling Co.*, 168 Kan. 177, 211 P. 2d 89; and *Sundgren v. Topeka Transportation Co.*, 178 Kan. 83, 283 P. 2d 444.)

Another rule the decisions of this court require us to apply in considering this appeal is that traumatic neurosis following physical injury long has been recognized as being compensable under Workmen's Compensation Laws, not only in England from whence we took our compensation act, but in this country under statutes quite like our own (*Morris v. Garden City Co.*, 144 Kan. 790, 792, 793, 62 P. 2d 920), and, the rule is applicable to such injury even though financial, marital and other worries play a part (*Hunnewell's Case*, 220 Mass. 351, 107 N. E. 934; *Rexroat v. State*, 142 Neb. 596, 7 N. W. 2d 163; *Peterson v. Dept. of Labor & Industries*, 178 Wash. 15, 33 P. 2d 650; *American S. & R. Co. v. Industrial Com.*, 59 Ariz. 87, 123 P. 2d 163; and, Horovitz on Workmen's Compensation, pp. 75, 76).

Keeping these rules in mind, we turn now to the record for the purpose of determining whether the evidence most favorable to claimant is sufficient to sustain the award. The claimant testified that on July 20, 1954, while in the employ of appellant he fell from a scaffold into a window of a house he was working on, striking his back and ribs on the window sill, and then fell from the window to the ground—a distance of four and a half to six feet; that he reported the accident to his superintendent and attempted to continue work but he could not do so; that he was immediately afflicted with pain in his side and lower back; that his superintendent told him to go to Dr. Clyde W. Miller, the company doctor, which he did; that Dr. Miller examined him, made x-rays and taped from, "right under my arm clear down to the right, down along below my belt," and that he told Dr. Miller his whole side was hurting. He further testified that he returned to work on July 28, 1954, to light duty as a "lead man," that he was in pain about the ribs, back and head but found he could keep his mind off it if he worked; that he had to quit work again on August 21, 1954, because of increased pain; that between July 28, 1954, and August 21, 1954, claimant lost two days work. He further testified that he was having difficulty in walking; that his doctor placed him in the hospital on August 28, 1954, where he was confined until September 30, 1954, when he was released. Claimant had no history of disability prior to the accident and was in good physical condition prior to that time.

Upon his admission to the hospital claimant found that it was becoming increasingly difficult to walk and that his shoulder was paining him severely; he fell frequently and on one occasion fell in a shower bath at the hospital after which his shoulder pained him more severely. Two weeks before he left the hospital he lost the use of his legs and was unable to walk, which condition exists at the present time. When claimant lost the use of his legs he also lost all sense of feeling in them; he was unable to move or to use them. When he was in the hospital, anesthetic tests were made by doctors who examined his lower extremities; they stuck pins into his legs, and used a vibrator and a tuning fork on them. Claimant left the hospital in an ambulance. He testified that when sitting down he felt like he was cut in two, and there was no feeling of life below his waist.

Sometime prior to the accident claimant had been buying a house and had made payments on it for about a year; he quit making payments in August or September, 1953. A foreclosure action was instituted and "foreclosure papers" were served upon claimant the first part of August, 1954. The trial court found that as a result of the judgment of foreclosure claimant moved from the premises on October 28, 1954. However, there was reference made to eviction papers, which were served upon claimant by the sheriff in August, 1954, to remove him from the premises. Claimant testified that the difficulty about his home did not cause him any worry or disturbance.

Dr. D. V. Conwell was a witness for claimant. He testified he was a psychiatrist and was in charge of the neurology and psychiatry division of the Hertzler Clinic for approximately 14 years; that he had examined claimant on January 11, 1955, and again on February 8, 1955, prior to the hearing before the examiner. He took the claimant's history and performed a complete examination including a detailed examination of his reflexes and sensations in his lower extremities; that claimant had an absence of all sensations below the ensiform (lower part of sternum or breastbone) and he did not respond to the pin pricks or the tuning fork or to any of the tests in his lower extremities; that he had loss of both deep and superficial sensations to the ensiform on both sides—he was numb; and, that claimant responded in a normal manner to all the sensory tests above the ensiform. Quoting from appellant's abstract, the fol-

lowing questions and answers appear as a part of his direct examination:

"Q. What diagnosis did you make, if any, at that time, Doctor, after the examination? A. Well, with the combination of complaints that we had *we thought that he had a nervous condition called a conversion hysteria.* Examiner Meador: Called what? A. Conversion hysteria. It is a form of a nervous break. . . . Q. (By Mr. Foster.) Is this sometimes called a traumatic neurosis? A. Called a traumatic neurosis or posttraumatic neurosis or a psychoneurosis. But they are all conversion hysteria—conversion hysteria seems to cover or be more of a descriptive term. Q. Before I go into the radiology report on this, Doctor, I would like for you to comment on this diagnosis, as to the nature of it, that is, is it permanent or how long does it last, and so forth. . . . A. Most of them recover. It is a matter of time, and it is a matter of apparently how much insight the patient has into his difficulties. *After trauma the time is rather an important element.* It has been figured out, . . . *that those that are going to make a spontaneous recovery usually do it in the first six months, and after that the rate of recovery drops to where in the second six months probably about half of them will recover, and in the third six months probably 15 to 20 percent, and after 18 months very few recoveries.* Q. After this 18-month period you are describing, then, there is no recovery, is that correct or— . A. Very few. Q. Very few. And by 'recovery' you mean, then that the man would be permanently disabled after 18 months? A. *I have seen them in their 27th and 28th year, personally, of a continuous process like we have here.*" (Emphasis ours.)

. . . . . . . . . . .

"Q. Is there anything, Doctor, that you can think of, other than the objective and subjective findings of your examination, that would affect your diagnosis—anything—or change it or make you alter it from what you described? A. *Oh, I suppose there might be influencing factors, but I haven't detected any of them here.*" (Emphasis ours.)

In response to a hypothetical question detailing the history of the injury on July 20, 1954, its consequences and treatment, the witness made the following answer:

"A. *The opinion is that this conversion hysteria may well be—this conversion hysteria reaction he had may well be the result of that trauma.* It would be much more apt to be a conversion hysteria resulting from the trauma than an organic spinal cord lesion which would be located clear up opposite the fourth dorsal vertebra, and where he has no area of sensitiveness there at all. That would fit with this line of anesthesia here. So I don't think he has a myelitis. *And a conversion hysteria could well follow a trauma in an hour or week or month or two months afterwards, if he had persistent symptoms.*" (Emphasis ours.)

On cross-examination Doctor Conwell testified in substance as

follows: Claimant had subdeltoid bursitis in the form of a nervous breakdown, a combination, causing pain in claimant's arm; that he found pathological process in the left shoulder but none as it concerned the lower extremities; that there was no physical impairment which would result in paralysis; that he felt the disuse or lack of use of the lower extremities was due to his nerves; that the numbness in his feet began approximately September 3, and the pseudo-paralysis began a week later; that pseudo-paralysis is a paralysis without pathological background; that a hysterical condition can arise from a number of causes, and some of them which might produce a paralysis similar to claimant's condition are family trouble, financial losses or emotional upsets; that claimant told the witness he didn't have family trouble of any consequence and gave the witness no information regarding his financial condition; that apparently claimant was handling his personal affairs pretty well until sometime in July or August, 1954, "then, for some reason or other, the man didn't feel able to compete with his job. And he has had this nervous collapse as a result." Claimant told the witness he was suffering from pain when he was working. The witness was asked the following questions and he made the following answers:

"Q. (By Mr. Brainerd.) If you would assume with me for a moment that Mr. Barr was named as a defendant in a mortgage foreclosure, covering his home located at 951 North Edwards or thereabout, which mortgage foreclosure was filed February 15, 1954; that thereafter and on the 9th day of June, 1954, a journal entry of judgment was entered foreclosing the mortgage on Mr. Barr's home; on August 16, 1954, a praecipe was filed for a writ of assistance— Well . . . that on the 18th day of August, 1954, the real estate was sold under the order of the clerk of the district court by the sheriff, and on or about that day the sheriff evicted— A. On what day? Q. On or about the 16th or 18th day of August, 1954, the sheriff evicted Mr. Barr from his home. Now, would you, in your opinion, believe that would be a sufficient financial involvement to cause this hysteria when viewed in connection with the fact he worked up until about the 20th day of August, 1954? . . . Q. To sum it up, Doctor, if a man's home was foreclosed under mortgage procedure and the property was sold by court order and he was evicted from his home by a sheriff, wouldn't that be a sufficient financial— A. When did all this business start? A. The sale was in the middle of August and he was removed from his home in the middle or the latter part of August, 1954. A. *Well, as far as the hysteria would be concerned, that could be a factor—particularly if he wasn't able to keep up with his work. And we have this left arm also to consider some, and that I don't think is hysteria.*" (Emphasis ours.)

. . . . . . . . . . . . . .

"Q. What are your findings, both subjective and objective, that would relate his hysteria back to his injury of July 20, 1954? A. There we have to take

into consideration the history of the thing.  Q. Now, in answering the first hypothetical question put to you, you didn't take into consideration the mortgage foreclosure and the financial development in the month of August, 1954, did you?  A. It didn't seem to be of enough moment to the man to tell me about it at the time.  Q. If he had given you that— A. He was complaining of his left arm and his inability to use his legs."

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q.  .  .  .  Will you assume for me the fact he did have financial troubles in August, and then tell me what your opinion would be as to the cause of this hysterical condition?  A. *I would still say the thing dates back to the accident.*  Q. *And what is the basis for your opinion?*  A. *Well, we consider the history is reasonably correct.*  Q. Would you be inclined to entirely ignore his financial condition, a condition that arose in August of 1954?  A. We see a lot of poor people and they are not in this bad a shape."  (Emphasis ours.)

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Well, assume he worked up until he entered the hospital.  Would you give any consideration to the fact that he worked up until that time?  A. I would consider that we had a poor man that was trying to get along and you say that he had financial obligations with his disability, and it was becoming unbearable.  Certainly, being thrown out of your home would aggravate— it wouldn't make you feel happy.  *It probably could be an aggravating factor.*" (Emphasis ours.)

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. Let me wind it up this way:  What do you point to, Doctor, that would eliminate his financial condition as being a cause of his hysteria?  A. I am afraid I don't understand your question.  Q. Well, before you are able to say that the cause of his condition is entirely related to the accident of July 20 you are going to have to eliminate the possible effect of the mortgage foreclosure in the middle of August, are you not?  A. Well, according to the record, however, he was seeing a doctor before he was foreclosed.  .  .  .  *I think this trouble is following the accident.*  Q. Now, what in your findings, in your opinion, entirely eliminates the effect of the mortgage foreclosure?  A. *I think it may be of some—it may be a contributing factor.*  Q. It is very possible it could be entirely the cause of it, isn't it, Doctor?  A. *I don't think so.*"  (Emphasis ours.)

On re-direct examination he testified as follows:

"Q. When Mr. Brainerd asked you in his cross examination if the claimant was suffering pain when he was working, you were referring to the working that took place after the accident of July 20, were you not—his complaint of pain while working during the intervening time he returned to work?  A. He didn't tell me about having pain previous to his accident at all.  Q. What would you rate the man's percentage of disability as being at this time?  A. *He would be totally disabled right now.*  Q.  .  .  .  this is the last question and this is an important one:  *Do you feel that this trauma, this hypothetical trauma I have described, was at least an aggravation causing his present condition?*  .  .  .  A. *That is what I thought.*"  (Emphasis ours.)

It should be stated that the three doctors who testified for appel-

lant controverted some of Dr. Conwell's testimony; other parts of their testimony could well be construed to support it and the trial court may well have given it consideration. However, no attempt has been made to relate appellant's evidence, since on review of findings of the trial court this court is concerned only with evidence which supports or tends to support the findings made. (*Smith v. Cudahy Packing Co.,* 145 Kan. 36, 40, 64 P. 2d 582; *Gallagher v. Menges & Mange Const. Co.,* 146 Kan. 506, 72 P. 2d 79; *Walker v. Finney County Water Users Ass'n,* 150 Kan. 254, 257, 92 P. 2d 11; *Williams v. Cities Service Gas Co.,* 151 Kan. 497, 499, 99 P. 2d 822; *Mitchell v. Mitchell Drilling Co.,* 154 Kan. 117, 118, 114 P. 2d 841; and, *Holler v. Dickey Clay Mfg. Co.,* 157 Kan. 355, 139 P. 2d 846.)

Summarizing Dr. Conwell's testimony with respect to whether there was traumatic relationship between the injury and disability, he said: "We thought he (claimant) had a nervous condition called a conversion hysteria"; that, "the conversion hysteria reaction he had may well be the result of that trauma (from the accident of July 20, 1954)"; that, "a conversion hysteria could well follow the trauma in an hour, a week or month or two months afterwards, if he had persistent symptoms"; that, "after trauma the time is rather an important element. Those who are going to make a spontaneous recovery usually do it in the first six months, and after that the rate of recovery drops to where in the second six months probably about half of them will recover and in the third six months probably 15 to 20 percent, and after eighteen months very few recover." When asked whether he considered the trauma was an aggravating cause of claimant's present condition, he said: "That is what I thought." With respect to whether he took into consideration claimant's financial involvements during August, 1954, in forming his opinion that claimant's disability was the result of the injury, he said, "Well, as far as the hysteria would be concerned, that would be a factor—particularly if he wasn't able to keep up with his work." He further said: "it probably could be an aggravating factor" of claimant's disability but he concluded his testimony by saying, "I would still say the thing dates back to the accident." With respect to the permanency of claimant's disability Dr. Conwell stated, "I have seen them in their 27th and 28th year, personally, of a continuous process like we have here," and "he (claimant) would be totally disabled right now." The evidence disclosed claimant had the persistent symptoms Dr. Conwell referred to; he had pain about his ribs, back

and head during the time he was working from July 28, 1954, until he quit work on August 21, 1954, because of increased pain.

When claimant's evidence is considered in the light of the evidence in the cases of *Vera v. Swift & Co.*, 143 Kan. 593, 56 P. 2d 96; *Son v. Eagle Picher M. & S. Co.*, 144 Kan. 146, 58 P. 2d 44; *Smith v. Cudahy Packing Co.*, supra, and *Long v. Lozier-Broderick & Gordon*, 158 Kan. 400, 147 P. 2d 705, held sufficient by this court to sustain awards to injured workmen, it will be readily observed it is more convincing than the evidence in these cases with respect to causal connection between the accident and the disability.

In the Vera case, *supra,* the employee died from a streptococcic infection. On the day the workman last worked for the employer, an elevator he was operating descended out of control several stories to the bottom of the elevator pit and rebounded a foot and a half. The claim was that the fall aggravated infection present in his body and contributed to his death. In this case there was no positive medical opinion that the elevator fall contributed to the workman's death, nor even that it *probably* did. The testimony was that such a fall could lower resistence and enhance the activity of an infective germ, if present, or that the fall *might* have caused the infection to flare up. This court said it did not feel justified in holding there was no substantial evidence to support the finding of the trial court.

In the Smith case, *supra,* claimant worked as a cattle butcher; he received a small cut or skin wound on his right arm. Within a week the wound had entirely healed. Several days later he developed ringworm on his right leg. In answer to a hypothetical question as to whether it was possible that the infection could have gotten into claimant's system by allowing hides from infected cattle to slip over the wound on his arm, one doctor answered, "he certainly could." To a similar question another doctor answered, "It would be possible," although he testified that ringworm is a local and not a systemic infection. This court affirmed a judgment on the ground that the evidence made certain the possibility of contracting the disease and practically eliminated every other source of infection.

In the Son case, *supra,* although the medical testimony was otherwise weak in the nature of establishing causal connection the doctor did, at one point, make the unqualified statement that, "The injury was the beginning of the trouble."

In the Long case, *supra,* a piece of slag penetrated a workman's eye. The doctor stated that the slag in the eye, "may have been the cause of the uveitis." This court in affirming the judgment held that the evidence of the eye specialist was stronger than the supporting evidence in either the Vera case, *supra,* or the Smith case, *supra,* and affirmed the judgment.

In view of the testimony of Dr. Conwell, we do not think appellant's contention can be sustained. The fact that Dr. Conwell did not state with certainty and exactness the cause of claimant's disability after a hypothetical question had been submitted to him, would be supposing an exactness in medical science to which most learned followers have not yet attained. (*Roark v. Greeno,* 61 Kan. 299, 59 Pac. 655.) That he admitted claimant's financial condition, which resulted in the loss of his home, could be an aggravating factor of cause of his disability is evidence of his professional honesty, and a clear indication he did not eliminate this factor in arriving at his opinion that the disability had traumatic relationship to the accident on July 20, 1954, and while financial worries may have been a contributing factor and were probably an aggravating cause to claimant's present condition, he said, "The thing dates back to the accident."

Before concluding we refer again to Dr. Conwell's testimony when he stated he thought the trauma in this case was at least an aggravation causing claimant's present condition. It should be pointed out our decisions (See West's Kansas Digest, Workmen's Compensation, § 556 and Hatcher's Kansas Digest [Rev. Ed.], Workmen's Compensation, § 16) universally hold that accidental injuries are compensable where an accident only serves to aggravate or accelerate an existing disease or intensifies the affliction.

In view of the previous holdings of this court, some of which have been heretofore discussed, we have no hesitancy in finding, as a matter of law, that the award in favor of claimant is based upon substantial evidence.

Having reviewed claimant's evidence and considered all the facts and circumstances in the light most favorable to the claimant, as we are enjoined to do both by the statute and the rule so often reiterated, we conclude there was substantial evidence to support the finding and judgment. The judgment is affirmed.