No. 45,204

Winifred Janousek, Widow of Frank L. Janousek, Deceased, *Appellant,* v. Western Star Mill Company, Self-Insurer, *Appellee.*

(440 P. 2d 616)

Opinion filed May 11, 1968.

*George E. McCullough,* of Topeka, argued the cause, and *W. L. Parker, Jr., Robert B. Wareheim, Reginald LaBunker,* and *James L. Rose,* all of Topeka, were with him on the briefs for the appellant.

*Frank C. Norton,* of Salina, argued the cause, and *Jerry E. Norton, Dan W. McCoy,* and *Robert L. Constable,* all of Salina, were with him on the briefs for the appellees.

The opinion of the court was delivered by

Kaul, J.: In this workmen's compensation case the district court denied an award to the wholly dependent wife of Frank L. Janousek, deceased, whose death, on February 24, 1965, resulted from a cerebral hemorrhage.

Decedent had worked for respondent, a self-insurer, for nineteen years. His duties consisted of filling orders by lifting and loading bags of grain onto a conveyer belt in respondent's feed mill. He was fifty-six years of age, five feet, nine inches tall, and weighed 215 pounds.

On the morning of his death, decedent arose at the usual time, around 6:15 a. m., he appeared normal to his wife and son, Frank, Jr., the other occupants of the home. After breakfast, at approximately 7:15, decedent went out to start his automobile. It failed to start and he returned to the house and asked his son to come out and push the automobile out of the driveway. The temperature was about zero degrees and a three-inch snowfall was on the ground. The snow had been removed from the Janousek driveway but remained on the street where it had been churned into slush the day before. The slush had frozen in a rough manner during

the night. Decedent's automobile was parked in front (toward the street) of the son's automobile. Both automobiles were headed toward the street on the driveway which inclined slightly toward the street. The son got into his automobile and Mrs. Janousek, hereafter referred to as claimant, got into decedent's automobile. The son started his automobile and pushed that of decedent down the driveway and just into the street. At this point the front bumper of the son's automobile and the rear bumper of decedent's automobile did not match and the latter could not be pushed further by Frank's automobile. Since decedent's automobile had not started, and blocked the son's automobile from entering the street, it was necessary to push, by hand, decedent's automobile out of the driveway. Claimant guided decedent's automobile while the decedent and the son pushed it several feet to a position along the street curbing, clearing the entrance to the driveway.

At this point, claimant and her husband drove the son's automobile to work, a distance of about three and one-half miles. They stopped en route to pickup a co-employee. Claimant testified that when they proceeded about half way to the mill her husband put his hand to the side of his head and said "Oh, I've got the funniest pain in my head." They arrived at the mill at about 7:55 a. m. Upon arriving decedent told claimant that he had left his glasses at home and asked her to get them.

Decedent checked in on the time clock shortly before 8 a. m. He was seen by a number of co-employees, several of whom spoke to him before he went to work. All of the co-employees, with one exception, testified they noticed nothing unusual about decedent's appearance when he reported to work. Paul Bell testified that decedent looked unusual and may have been pale but he thought it was because decedent was not wearing his glasses.

After checking in, decedent and his fellow employee, Roy Throne, went to their working area on the third floor of the mill. Throne read the work orders for the day. The first order was to load out twenty 50-pound bags of grain, ten of one kind and ten of another. The decedent walked around behind a stack of grain bags to reach the bags of grain called for in the first order. He lifted ten bags, approximately four feet up and over a stack of other grain bags, and handed them to Throne, who then transferred the bags to a conveyer belt. After lifting the first ten bags, and passing them to Throne, decedent told Throne he had a terrible headache, and Throne suggested that he get some aspirin. Throne testified that,

at this time, decedent looked "kind of flushed from bending over, kind of red." Throne and decedent then loaded ten more bags of feed on the conveyer belt, each lifting five of them. At this point decedent told Throne "I believe I'll go take some aspirins," and left the working area. Throne testified it was around 8:15 a.m.

Decedent was next seen in the basement by several co-employees; whether he rode the elevator to the basement or went down the stairs is unknown. A co-employee, Cecil Pederson, saw decedent sitting on a five-gallon bucket, he appeared chalk white with beads of perspiration on his face. Pederson asked decedent "What's the matter Frank?" decedent replied "I've got a hell of a headache." Pederson inquired if he should call Mrs. Janousek or Gary, decedent's son, who also worked at the mill. The decedent answered it would not be necessary that he would be all right in a minute. Pederson then left the area. Decedent was next seen by co-employees, Paul Bell, John Van Dorn and Jack Plunkett.

Punkett testified that decedent looked pretty sick so he decided to call Gary.

Decedent was taken by ambulance to the hospital about 8:30 a.m. He was unconscious on arrival at the hospital and died at 5 that afternoon. On arrival at the hospital he was examined by Dr. Robert Weber, a specialist in internal medicine. Dr. Weber testified that he obtained from claimant and her son the history of decedent's case, relative to pushing the automobile and his complaining of a peculiar type of headache on the way to work; and that after decedent had been at work for a while he started vomiting and became unresponsive.

Dr. Weber further testified as follows:

"At the time that I first saw the decedent as I stated earlier, I felt that he had a cerebral hemorrhage as a result of the history which I obtained from the wife and son. I felt that this had occurred prior to his going to work. How much work he did that morning was not factually available to me as stated in your hypothetical situation. I would still feel that the hemorrhage had occurred prior to his going to work, that it did occur with the exertion of pushing the car. How much effect the work which he did would have on the hemorrhage would be conjectural. Is that a good word. Would be purely conjectural. It is not unusual for a patient that has a cerebral hemorrhage to have a period of 20 to 40 minutes during which time he is conscious. The onset of the symptoms are gradual but progressive and obviously any strenuous activity might affect this. How much he was capable of doing after he got to work would even be a question with his cerebral hemorrhage. I can really only state the facts as I obtained them at the time, and at the time of my

examination with the history available. I felt that this had occurred prior to his going to work."

Dr. Weber's opinion was that lifting the bags of grain had no effect upon the preexisting condition but on cross-examination he admitted that lifting the bags would be exertion which would increase the blood pressure, resulting in some increase in the bleeding.

Dr. Weber also testified that in the absence of an autopsy it was impossible to determine whether the. hemorrhage resulted from a ruptured aneurysm or from preexisting hypertension and arteriosclerosis.

Dr. Weber's examination revealed decedent's blood pressure was 170 over 100, his pulse rate of 64 and regular at the time of admission. A spinal tap was performed and the lumbar puncture revealed the spinal fluid pressure to be 600 millimeters of water and the fluid was grossly bloody. The presence of the amount of blood in the spinal fluid indicated a rather massive cerebral hemorrhage.

When questioned concerning the time of decedent's cerebral hemorrhage Dr. Weber testified as follows:

"Q. In your opinion, when was the cerebral hemorrhage with reference to time that morning?

"A. I felt that the cerebral hemorrhage probably occurred when he was pushing the car as a result of the history that I obtained.

"Q. On what factors do you base that conclusion?

"A. On the basis of the history as given by the son and his wife, who related that the patient complained of this headache prior to—I mean after pushing the car.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"Q. The question is then what difference did it make, if any, whether he worked after the onset of the cerebral hemorrhage or whether he had gone to bed. Is it likely that death would have resulted either way?

"A. Well, I think that after the hemorrhage had started that death would have resulted either way, and I have no way of knowing what the effect of the work had; but the experience that I have had with cerebral hemorrhage of this type, it is very unsatisfactory.

"Q. So based upon reasonable medical certainty, you would say that the work had no effect on the ultimate outcome of Mr. Janousek's cerebral hemorrhage?

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"A. Not to my—not to the best of my knowledge.

"Q. That would apply in all instances where there is a cerebral hemorrhage, isn't that correct?

"A. The prognosis is very poor in any patient that has had a cerebral hemorrhage. However, generally, patients with cerebral hemorrhages—well, this would apply.

"Q. But there would be no way whatsoever in knowing that Mr. Janousek was within the 15 percent group, isn't that correct?

"A. There would be no way of knowing.

"Q. And your opinion as to his specific case, as you have testified to, based upon reasonable medical certainty, the activity which he did following the onset had no relationship to his eventual chances of recovery or death?

.   .   .   .   .   .   .   .   .   .   .   .   .

"Q. You may answer the question, if you can.

"A. I would agree."

Dr. Ernest R. Schlachter, a general practitioner, testified for claimant. His testimony was generally in agreement with that of Dr. Weber. He stated that the average mortality rate for cerebral hemorrhage was about 85 percent. Since he had not seen decedent at any time, Dr. Schlachter could only testify regarding statistics.

Both doctors concluded the initial bleeding started when decedent pushed the automobile. The doctors also agreed that cerebral hemorrhage carried an 85 percent mortality.

It was Dr. Schlachter's opinion:

".   .   . The best that could be said of doing the type work that he was doing would be that it may have speeded up the process by a period of, at the most, of thirty minutes."

Dr. Schlachter further stated:

"From a statistical standpoint alone the odds are all against the work he was doing being the cause of death, although certainly one could testify that it precluded any chance of recovery he may of had."

The Workmen's Compensation Examiner denied compensation finding that decedent sustained a cerebral hemorrhage prior to his arrival at work; that at that time the possibility of decedent's recovery was slight; that the hemorrhage was not causally connected with decedent's employment; and that claimant had not met the burden of proof in establishing that decedent may have survived the hemorrhage but for the exertion of his employment.

In due course claimant filed an application for a director's review. The director reversed the award entered by the examiner finding in substance that it was irrelevant as to whether decedent would have died without the intervening accident, and that, even assuming he probably would have died without an intervening accident, nevertheless, if the intervening accident had caused the death of the injured workman it was a compensable accident.

The respondent appealed to the district court which found, in pertinent part, as follows:

"The cause of death was established as a cerebral hemorrhage which the

medical witnesses agree had its onset at about 7:30 to 7:35 a.m. or thereabouts, on the date of death, during or immediately following the decedent being engaged in pushing an automobile preparatory to going to work.

"The only issue before the court is whether decedent met with personal injury by accident arising out of and in the course of his employment and whether his death occurred as a result thereof.

"The Examiner found that the hemorrhage and the decedent's work were not causally connected and denied compensation. The Director reversed the Examiner and awarded compensation holding that the exertion of the work decedent performed between arriving at work at 8:00 and his becoming unconscious about 8:30 hastened his death and constituted an accident and was compensable.

"In consideration of the evidence, the arguments of counsel and briefs, the court finds that the award made by the Examiner in favor of the respondent and against the claimant denying compensation is correct under the evidence herein; that the decedent died of a cerebral hemorrhage sustained prior to his arrival at work on February 24, 1965; that the hemorrhage did not arise out of and in the course of nor was it causally connected with decedent's employment; that the effect, if any, of the decedent's exertion at work on his hemorrhage is 'purely conjectural' and that any causal connection between the employment and the death of the workman is not within reasonable medical certainty."

One point is specified by claimant on appeal:

"Did the trial court err as a matter of law in basing its finding of fact on an erroneous conclusion of law that the appellant must establish a causal connection between the employment and accidental death within the degree of reasonable medical certainty?"

Claimant admits the question whether the accidental death arose out of and in the course of employment is one of fact and the determination thereof, if supported by any substantial competent evidence, is not subject to review by this court.

In attempting to present a question of law on appeal, claimant resourcefully construes the trial court's decision to be a finding of fact, based on an erroneous conclusion of law, i. e., that claimant must establish causal connection between employment and accidental death within a degree of reasonable medical certainty.

We cannot agree with claimant's interpretation of the trial court's decision. A careful reading of the decision discloses the court first announced the only issue to be whether decedent met with personal injury by accident arising out or and in the course of his employment. The court then proceeded to find that decedent died of a cerebral hemorrhage sustained prior to his arrival at work, and that the hemorrhage did not arise out of and in the course nor was it causally connected with his employment. The court did add that

the effect, if any, of the exertion at work on his hemorrhage is purely conjectural and any causal connection with the death of the workman is not within reasonable medical certainty. The last comment in the decision, we believe, only indicates the trial court's viewpoint that, under the evidence in this case, any causal connection was conjectural and not within medical certainty, not that medical certainty was a prerequisite to a finding of causal connection.

It is true, as claimant points out, that we have held that "could have," "possible" or "may have" testimony is sufficient from a medical standpoint to sustain an award. (*Hanna v. Edward Gray Corporation,* 197 Kan. 793, 421 P. 2d 205; *Karle v. Board of County Commissioners,* 188 Kan. 800, 366 P. 2d 241; *Barr v. Builders, Inc.,* 179 Kan. 617, 296 P. 2d 1106, and *McDonald v. Rader,* 177 Kan. 249, 277 P. 2d 652.) A comprehensive discussion of the standards of proof required to sustain compensation in heart and hemorrhage cases may be found in *Hanna v. Edward Gray Corporation,* supra.

In this case the evidence is undisputed that decedent's death was a result of a cerebral hemorrhage which had its onset while the decedent was pushing his automobile. As to the effect of exertion by decedent while at work there is some discrepancy in the opinions of the two doctors. The trial court, and the examiner, accepted the opinion of Dr. Weber, perhaps because he actually examined decedent or because of some inconsistency in Dr. Schlachter's testimony. Dr. Weber's testimony is substantial competent evidence and adequate to support the finding of the trial court. A comparison of the testimony of the two doctors is not within the jurisdiction of the appellate court under our many decisions wherein we have stated that determination of facts is a matter for the trial court, along with the credibility of the witnesses and weight to be given to their testimony. (*Karle v. Board of County Commissioners,* supra.)

The judgment is affirmed.