No. 40,282

ASPHALT PAVING, INC., a Corporation, *Appellant,* v. INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, STABLEMEN AND HELPERS OF AMERICA, LOCAL UNION No. 795; S. E. SMITH, Individually and As Business Agent of Said Labor Organization; HOISTING AND PORTABLE ENGINEERS, LOCAL UNION No. 101; OLIN MILES, Individually and As Business Agent of Said Labor Organization, et al., *Appellees.*

(317 P. 2d 349)

Opinion filed October 5, 1957.

*Carl T. Smith,* of Wichita, argued the cause, and *George B. Powers, John F. Eberhardt, Samuel E. Bartlett, Stuart R. Carter, Robert C. Foulston, Malcolm Miller, Robert N. Partridge, Robert M. Siefkin, Richard C. Harris* and *Gerald Sawatsky,* all of Wichita, were with him on the briefs for appellant.

*Russell Cranmer,* of Wichita, argued the cause, and *Payne H. Ratner, Louise Mattox, Payne H. Ratner, Jr., Dale B. Stinson, Jr., Cliff W. Ratner, William L. Fry, A. Wayne Murphy, Bernard V. Borst* and *D. Clifford Allison,* all of Wichita, were with him on the briefs for International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers of America, Local Union No. 795; S. E. Smith, Individually and as Business Agent of Said Labor Organization, appellees.

*John J. Manning,* of Kansas City, Missouri, argued the cause, and *Gerald Michaud,* of Wichita, was with him on the briefs for Hoisting and Portable Engineers, Local Union No. 101, and Olin Miles, appellees.

The opinion of the court was delivered by

FATZER, J.: The principal question here presented is whether the district court had jurisdiction to enjoin the defendant labor unions and their agents from peacefully picketing construction projects

and general contractors who employed union labor, with an objective of forcing termination of their contracts with plaintiff who employed nonunion labor, the ultimate objective being to force plaintiff's recognition of one of the defendants as the bargaining agent of its employees and cause it to enter into an all-union agreement without approval of a majority of its employees to be governed thereby, in violation of G. S. 1955 Supp. 44-809 (4).

Both parties introduced evidence at a hearing for a temporary injunction, at the conclusion of which, upon motion of defendants, the district court dismissed the action upon two grounds: First, that it did not have jurisdiction of the subject matter since the controversy was governed by the Labor Management Relations Act, 1947, hereafter referred to as Taft-Hartley (29 U. S. C. A. § 141, *et seq.*); and second, that the National Labor Relations Board (29 U. S. C. A. § 160 [a]) had exclusive jurisdiction of the controversy. Plaintiff has appealed from that ruling.

Defendant S. E. Smith was business agent for defendant Teamsters Local Union No. 795, and defendant Olin Miles was business agent for defendant Hoisting and Portable Engineers Local Union No. 101. Both defendant labor unions are affiliated with American Federation of Labor and each has a business office in Wichita.

We summarize or quote portions of the record bearing upon the question presented, as follows: Plaintiff is a Kansas corporation engaged in the business of paving parking lots and driveways with asphalt and does an annual gross business of approximately $200,000. It performs no state or municipal work. Jobs of less than $1,000 constitute seventy-five percent of its volume. Plaintiff's mixing plant and principal office are located on North Broadway in Wichita, Sedgwick County, Kansas, where it employs ten to twelve men, none of whom belong to defendant unions or any other labor union. No controversy of any character existed between plaintiff and its employees; the relationship between them was mutually harmonious. Plaintiff performed all its work in Sedgwick County and procured all materials there or in adjoining Butler County. It purchased all its equipment within the state of Kansas, although one roller and one grader of the approximate value of $21,700 were manufactured outside the state.

Plaintiff alleged unlawful acts of combination in restraint of trade, and that various employees of general contractors were induced to strike their employment, the objective being to force the general

contractors to cease doing business with plaintiff; conspiracy on the part of defendants and their agents to injure and destroy its good will, trade and business, and of irreparable damage thereto; lack of adequate remedy at law; and, that the devices and activities of defendants were in violation of the provisions of Ch. 252, Laws of Kansas 1955. (G. S. 1955 Supp. Ch. 44, Art. 8.) No pleadings were filed by the defendants.

Evidence at the hearing for a temporary injunction established, among other things, the following: In January, 1955, plaintiff was installing an asphalt parking lot for a Safeway store at Douglas and West Streets in Wichita and was forced to complete that job by using drivers who were members of defendant Teamsters Union.

Prior to July 1955 one Pearson, representing the defendant Hoisting Engineers, requested a conference with plaintiff, saying he had contacted the other trades and that they would like to sit in on the conference. At that conference, plaintiff was advised by Miles and Pearson that it would have to use union labor as long as the Union could furnish proper employees, and that it could not use nonunion labor on its small or noncommercial jobs. Plaintiff refused defendants' demand since the larger part of its annual gross dollar volume was from small noncommercial jobs and to employ union labor would make it economically infeasible to compete in the construction business.

During October 1955 plaintiff had subcontracts with general contractors and contracts with owners of construction projects to install asphalt covering on parking lots adjacent to five buildings in the process of construction, where only union labor was employed by the general contractors. One of such contracts was with Love Box Company, an industry conceded to be subject to the jurisdiction of Taft-Hartley, where Hahner & Foreman, Inc., the general contractor, was finishing a new factory building. Hahner & Foreman did a gross annual business of $1,500,000 of which approximately $400,000 in materials was purchased in the state of Kansas but originated outside the state in interstate commerce. In addition, purchases of $16,111 were made directly from interstate points. Another contract was with Bleckley, Inc., where Weller & Boucher Construction Company, the general contractor, was constructing a medical office building. Weller & Boucher did a gross annual business of approximately $1,000,000, of which $500,000 of materials were purchased locally but originated outside the state of Kansas

in interstate commerce. Another contract was with Soderberg Construction Company which was constructing a Safeway store and a retaining wall at Kellogg and Lightner Streets in Wichita. The fourth contract was with the East Side State Bank, which was having its bank building constructed by Soderberg Construction Company at Windsor and Kellogg Streets in Wichita. Of Soderberg's $1,000,000 annual volume, $300,000 was in materials purchased locally but originated outside the state in interstate commerce. The fifth contract was with Cessna Aircraft Company, an interstate concern, by which that company was having Vollmer Construction Company, its general contractor, extend and repair an airplane hangar. Vollmer did a gross annual business of $3,700,000, and purchased locally $661,000 worth of materials originating in interstate commerce and $60,000 worth directly from interstate points outside the state of Kansas.

In an attempt to unionize plaintiff's employees and secure an all-union agreement affecting them, the Hoisting Engineers peacefully picketed the work area at Safeway at Kellogg and Lightner Streets, and both defendants peacefully picketed the work areas at Cessna and Love Box. As a result of the picketing and because of plaintiff's nonunion status, unionized masons, carpenters, electricians and other craftsmen employed by Hahner & Foreman, by Soderberg, and by Vollmer, walked off the jobs. Plaintiff's plant on North Broadway was not picketed. At the other two construction areas, threats were made by agents of defendant Hoisting Engineers to Weller & Boucher and to Soderberg that unless plaintiff's contracts were terminated, union employees of those general contractors would strike and walk off the jobs. As a result, plaintiff's contracts were terminated at each of the five construction projects.

The testimony of Robert Love, Vice President of Love Box, illustrates the technique of defendants at that company's work area. Love testified that Miles of Hoisting Engineers and Smith of Teamsters directed the picketing. At a conference following the strike of union employees as a result of the picketing, Smith and Miles entered into negotiations with Love and told him that as a condition for withdrawal of the pickets and resumption of work by the union employees of Hahner & Foreman, the Love Box contract with plaintiff would have to be canceled. Acceding to that pressure, Love ordered plaintiff to leave the job and called Inland Construction Company, a unionized employer, to complete the parking lot.

Smith confirmed the Inland contract, and stated he would "show" plaintiff it would do no commercial work until it "got right with the union." Later, the pickets were withdrawn and work was resumed by union employees of Hahner & Foreman. Inland Construction Company is one of the larger foreign corporations engaged in the construction industry in Kansas and in the Middle West.

Plaintiff vigorously contends the trial court had jurisdiction over the subject matter of the controversy, asserting three grounds: *First*, that its business operations were so local in nature that neither its operations nor defendants' activities affected interstate commerce within the meaning of Section 2 (29 U. S. C. A. § 152 [6] and [7]) and Section 10 (a) (29 U. S. C. A. § 160 [a]) of Taft-Hartley; *second*, that Section 14 (b) (29 U. S. C. A. § 164 [b]) leaves open to the states, where the union shop is prohibited or regulated, the determination of any matter bearing upon the execution or application of union security agreements, and, in such cases, the general law with respect to unlawful conduct, applies; and *third*, assuming, *arguendo*, that defendants' activities affected interstate commerce, plaintiff need not apply to the National Labor Relations Board for relief when that board would manifestly decline jurisdiction of the controversy on the basis of jurisdictional standards adopted by it in 1954.

Two questions are intertwined in plaintiff's first contention of jurisdiction: (1) Were the activities of defendants an "unfair labor practice" prohibited by Section 8 (b) (29 U. S. C. A. § 158 [b]) of Taft-Hartley? (2) If they were, did those activities "affect commerce" as defined in 29 U. S. C. A. § 152 (6) and (7), so as to empower the National Labor Relations Board to prevent a continuation of the prohibited practices (29 U. S. C. A. § 160 [a])? If the record before us requires affirmative answers to both questions, we must uphold dismissal of plaintiff's action, as related to its first jurisdictional contention.

Preliminary to discussing this phase of the controversy, we turn to what we consider established rules enunciated by the Supreme Court of the United States in its interpretation of Taft-Hartley: First, in the exercise of its constitutional authority to protect interstate commerce, Congress may regulate not merely transactions or goods in interstate commerce, but activities which in isolation might be deemed to be local and yet in the course of the interlacing of business, affect adversely interstate commerce (*Labor Board v.*

*Jones & Laughlin Steel Corp.,* 301 U. S. 1, 81 L. Ed. 893, 57 S. Ct. 615, 108 A. L. R. 1352; *Wickard v. Filburn,* 317 U. S. 111, 87 L. Ed. 122, 63 S. Ct. 82; *Polish Alliance v. Labor Board,* 322 U. S. 643, 88 L. Ed. 1509, 64 S. Ct. 1196; *Bethlehem Co. v. State Board,* 330 U. S. 767, 91 L. Ed. 1234, 67 S. Ct. 1026); second, as explained by the Supreme Court in one of its recent cases treating congressional pre-emption in the labor field, "a state may not prohibit the exercise of rights which the federal act protects" (*Weber v. Anheuser-Busch, Inc.,* 348 U. S. 468, 99 L. Ed. 546, 75 S. Ct. 480; *Hill v. Florida,* 325 U. S. 538, 89 L. Ed. 1782, 65 S. Ct. 1373; *Automobile Workers v. O'Brien,* 339 U. S. 454, 94 L. Ed. 978, 70 S. Ct. 781; *Bus Employees v. Wisconsin Board,* 340 U. S. 383, 95 L. Ed. 364, 71 S. Ct. 359) nor enjoin under its own labor statute in the furtherance of its public policy, conduct which has been made an "unfair labor practice" under Section 8 (29 U. S. C. A. § 158) of Taft-Hartley (*Garner v. Teamsters Union,* 346 U. S. 485, 98 L. Ed. 228, 74 S. Ct. 161; *Plankinton Packing Co. v. Wisconsin Employment Relations Board et al,* 338 U. S. 953, 94 L. Ed. 588, 70 S. Ct. 491; *Weber v. Anheuser-Busch, Inc.,* supra); third, Congress, by the enactment of Taft-Hartley, has regulated labor relations to the full extent of its legislative power under the commerce clause (Art. I, Sec. 8) whereby it outlawed some aspects of labor activities and left others free for the operation of economic forces, but as to both categories, the areas that have been pre-empted by federal authority have been withdrawn from state power (*Bus Employees v. Wisconsin Board,* supra; *Labor Board v. Fainblatt,* 306 U. S. 601, 83 L. Ed. 1014, 59 S. Ct. 668; *Weber v. Anheuser-Busch, Inc.,* supra, pp. 475, 476; *Garner v. Teamsters Union,* supra; *Guss v. Utah Labor Board,* 353 U. S. 1, 1 L. Ed. 2d 601, 77 S. Ct. 598).

On the other hand, the following cases are authority that state power has not been exclusively absorbed by Taft-Hartley with respect to conduct affecting interstate commerce, and that state courts may enjoin mass picketing, threatening employees, obstructing streets and highways, picketing homes, blocking the entrance to or egress from a factory, coercing employees who wish to refrain from striking, interfering with others approaching an area where a strike is in progress, recurrent unannounced work stoppages, enforcement of a maintenance-of-membership clause in union security agreements, and they may award damages for a common law tort based on violent conduct and enforce criminal statutes against con-

duct violative of them (*Allen-Bradley Local v. Board*, 315 U. S. 740, 86 L. Ed. 1154, 62 S. Ct. 820; *Auto Workers v. Wis. Board*, 336 U. S. 245, 93 L. Ed. 651, 69 S. Ct. 516; *United Workers v. Laburnum Corp.*, 347 U. S. 656, 98 L. Ed. 1025, 74 S. Ct. 833; *Auto Workers v. Wisconsin Board*, 351 U. S. 266, 100 L. Ed. 1162, 76 S. Ct. 794; *Algoma Plywood Co. v. Wis. Board*, 336 U. S. 301, 93 L. Ed. 691, 69 S. Ct. 584). The record here does not disclose conduct of the character to permit application of the rule announced by these authorities.

The district court found that plaintiff did not seek relief from the National Labor Relations Board prior to commencing this action; that the negotiations on July 3, 1955, by Miles were for the purpose of inducing plaintiff to employ only union labor on all work except municipal construction; that plaintiff failed to establish its allegations of conspiracy; and, "that the interference by defendants with the employees of the plaintiff had a direct impact upon Interstate Commerce in that the picketing by the defendants resulted in a strike situation which caused the employees of prime (general) contractors engaged to a large extent in Interstate Commerce to leave their jobs." It concluded that the issues involved interstate commerce and that before it could exercise jurisdiction, application should have been made by plaintiff to the National Labor Relations Board.

The district court was too euphemistic. The "negotiations," the "strike situation" which was described, the "interference by the defendants with the employees of the plaintiff," upon these facts, the whole situation cries out that there was a secondary boycott made unlawful by state law (G. S. 1955 Supp. 44-809a [1]) and condemned by Taft-Hartley as an unfair labor practice (29 U. S. C. A. §§ 158 [b] [4] [A], 187 [a] [1]). The record clearly imports a secondary boycott and we construe the findings of fact as so reading.

In the background of this controversy was a standing labor dispute between defendants and plaintiff due to the latter's employment of nonunion labor on paving jobs at or near construction sites in Wichita. Defendants do not contend that a primary dispute existed with any of the general contractors since they employed only union labor; rather, defendants' purpose was to compel plaintiff, in the language of defendant Smith, "to get right with the union." Thus, it was plaintiff's employees defendants sought to unionize,

and in order to attain that objective, defendants were required to secure an all-union agreement from plaintiff (G. S. 1955 Supp. 44-802 [3] [5], 44-809 [4]), which they sought to do by asserting pressure to compel it to comply with their demands, or be forced off each job. This was done by applying secondary pressure on each general contractor, or on the owners of construction projects, by peacefully picketing the work area, or by threats of concerted cessation of work by all union employees. Defendants' conduct was a secondary boycott of which there can be no "good" variety (Sen Rep No 105, 80th Cong 1st Sess 8). It is settled that a labor union commits an unfair labor practice within the meaning of 29 U. S. C. A. § 158 (b) (4) (A), which prohibits requiring an employer to cease doing business with another, where the labor union engages in peaceful picketing to induce or encourage a strike or by making threats of concerted cessation of work with the objective, although not necessarily the only one, of forcing a general contractor on a construction project to terminate a contract with a subcontractor doing work on or around that project who employs nonunion labor (*Labor Board v. Denver Bldg. Council*, 341 U. S. 675, 95 L. Ed. 1284, 71 S. Ct. 943; *Electrical Workers v. Labor Board*, 341 U. S. 694, 95 L. Ed. 1299, 71 S. Ct. 954; *Carpenters Union v. Labor Board*, 341 U. S. 707, 95 L. Ed. 1309, 71 S. Ct. 966). See, also, extensive annotations in 32 A. L. R. 779, 116 A. L. R. 484, 16 A. L. R. 2d 769 and 32 A. L. R. 2d 1026.

Moreover, plaintiff alleged that the object of defendants' conduct and activities ". . . is to force the employers and owners (general contractors and owners of construction projects) . . . to cease using and dealing in the products of plaintiff and to cease doing business with plaintiff . . .," further, ". . . to force and require plaintiff to organize or bargain with said local unions as representative of plaintiff's employees . . .," and ". . . to refuse to employ any person who is not a member of either of said local unions . . ." These allege unfair labor practices prescribed by Taft-Hartley in at least three respects: (1) Engaging in a secondary boycott to induce general contractors and owners of construction projects to cease doing business with plaintiff in violation of 29 U. S. C. A. §§ 158 (b) (4) (A), 187 (a) (1); (2) restraining plaintiff's employees in the exercise of rights guaranteed them by 29 U. S. C. A. § 157, to join, form or assist labor organizations, to bargain collectively and to engage in concerted activities

for that purpose, or to refrain from such activities; (3) causing or attempting to cause plaintiff to discriminate against its employees in regard to terms, tenure or condition of employment by encouraging membership in defendants' labor organizations prohibited by 29 U. S. C. A. § 158 (b) (2) and (a) (3).

When an action is commenced in a state court involving a labor controversy and the district court's jurisdiction is denied, the court must determine that question for itself. It cannot stop the proceedings and refer the matter to the National Labor Relations Board; nor will a federal court interfere to forestall the state court's determination of jurisdiction at the behest of a private litigant (*Clothing Workers v. Richman Bros.*, 348 U. S. 511, 99 L. Ed. 600, 75 S. Ct. 452). However, a state court should, in deference to the National Labor Relations Board, decline jurisdiction of an action for injunctive relief, where the plaintif itself alleges unfair labor practices, and the facts alleged reasonably bring the controversy within the sections of Taft-Hartley prohibiting those practices, and where the conduct, if not prohibited by the federal act, may be reasonably deemed to come within the protection afforded by that act (*Weber v. Anheuser-Busch, Inc.*, supra; *Garner v. Teamsters Union*, supra; *Amalgamated Meat Cutters, Etc. v. Johnson*, 178 Kan. 405, 419, 286 P. 2d 182; *Kaw Paving Co. v. International Union of Operating Engineers*, 178 Kan. 467, 475, 290 P. 2d 110).

In view of the record presented and the allegations made by plaintiff, we conclude the defendants were engaged in a secondary boycott made unlawful by the laws of Kansas (G. S. 1955 Supp. 44-809a [1]), but which also constituted unfair labor practices under 29 U. S. C. A. § 158 (b), and since Taft-Hartley contains complete administrative and judicial remedies to prevent a continuation of them, provided, of course, they affected interstate commerce, the district court lacked jurisdiction to issue an injunction. As indicated previously, a state may not enjoin under its own labor statute conduct which has been made an "unfair labor practice" under Section 8 (29 U. S. C. A. § 158) of Taft-Hartley, since the National Labor Relations Board has primary exclusive jurisdiction (*Garner v. Teamsters Union*, supra; *Weber v. Anheuser-Busch, Inc.*, supra; *Guss v. Utah Labor Board*, supra; *Amalgamated Meat Cutters, Etc. v. Johnson*, supra; *Texas Const. Co. v. H. & P. E. Local Union No. 101*, 178 Kan. 422, 286 P. 2d 160; *Kaw Paving Co. v. International Union of Operating Engineers*, supra; *City Motors v. In-*

*ternational Ass'n of Machinists, Lodge No. 778 A. F. of L.*, 179 Kan. 157, 292 P. 2d 1102).

Thus, we approach a crucial question in this controversy—whether defendants' unfair labor practices "affected commerce," and we refer to Taft-Hartley for a concept of the extent to which that term implies. "Commerce" means, according to 29 U. S. C. A. § 152 (6) "trade, traffic, commerce, transportation or communication among the several states." The term "affecting commerce," defined in subsection (7), means "in commerce, or burdening or obstructing commerce or the free flow of commerce, *or having led or tending to lead to a labor dispute burdening or obstructing commerce or the free flow of commerce.*" (Emphasis supplied.)

Preliminary to considering this point, we refer to an annotation in 16 A. L. R. 2d 775 dealing with the question whether local construction work affects interstate commerce, where it was said:

"More cases involving the secondary boycott ban of the Taft-Hartley Act have arisen in the building and construction industry than in any other. This is perhaps due to the close co-operation which exists between the various craft unions in the building trades and to the traditional reluctance of such members to work with nonunion men. Up to the enactment of the Taft-Hartley Act, no serious effort was made to include local construction within the purview of the National Labor Relations Act, but it has been the policy since that time to include all forms of local construction within the Act."

.    .    .    .    .    .    .    .    .    .    .    .    .

"The courts have looked beyond the purely local nature of the work done and the dispute involved, in cases involving building trades unions and local construction work, and have concluded that the unfair labor practice provisions of the Taft-Hartley Act are applicable because of the likelihood that interstate commerce would be adversely affected if everyone took the same position as that of the union involved in the particular case."

Whether defendants' activities were such as to permit the National Labor Relations Board "to prevent any person from engaging in any unfair labor practice . . . affecting commerce" (29 U. S. C. A. § 160 [a], became, under the record in this case, a question of fact, which was answered by the district court in the affirmative. Our task is not to determine whether we would have reached the same conclusion as did the district court, but rather, to ascertain whether there was substantial evidence to sustain the findings made, and in so doing, review all evidence in the light most favorable to. the prevailing party below (*Evans v. Board of Education of Hays*, 178 Kan. 275, 284 P. 2d 1068; *Barr v. Builders, Inc.*, 179 Kan. 617,

296 P. 2d 1106). Numerous decisions of like import will be found in 1 Hatcher's Kansas Digest (Rev. Ed.) § 507, p. 206.

The precise question of conduct "affecting commerce" as a question of fact was not determined in our former decisions involving labor litigation. In *Amalgamated Meat Cutters, Etc. v. Johnson,* supra, the fact of interstate commerce was not disputed. In the same posture is *Kaw Paving Co. v. International Union of Operating Engineers,* supra. The question again, seems not to have been contested in *Texas Const. Co. v. H. & P. E. Local Union 101,* supra, nor in *City Motors v. International Ass'n of Machinists, Lodge No. 778, A. F. of L.,* supra. It is finally in the instant case that we are required to ascertain whether defendants' unfair labor practices affected commerce within the meaning of 29 U. S. C. A. §§ 152 (6) and (7), and 160 (a). We specifically decline, in answer to the question presented, to decide this case on the basis, for example, that if any one of the general contractors were engaged in interstate commerce it would follow that defendants' activities likewise affected commerce, or that we could not so hold because the operations of the ultimate victim, *i. e.,* Asphalt Paving Company, were so essentially local in character that they would preclude such a finding.

By not looking solely to plaintiff's business operations nor to those of any one of the general contractors against whom the secondary pressure was applied, but rather, casting our regard upon a combination of plaintiff's operations and the total business of all the general contractors, there was substantial evidence that defendants' unfair labor practices affected commerce. As an integral part of this conclusion, however, we enter our caveat that a reversal would not necessarily follow because a district court found otherwise upon the same or similar facts, nor necessarily, would a case analogous in its outlines be controlled by this conclusion as a matter of *stare decisis.* On the contrary, we treat the matter of an interstate flow of commerce and the existence of a burden upon it as one of fact, and review the record to determine whether substantial evidence supports the findings, measured by decisions construing Taft-Hartley in that respect.

Although the business of plaintiff was essentially local in character, other businesses were necessarily affected, some of which were conceded to be interstate in character, and we think the totality of the situation should be considered in measuring the commerce

impact, both that which resulted from the secondary boycott and that which was likely to result, rather than to view the activities of plaintiff and each general contractor separately (*Polish Alliance v. Labor Board,* supra; *Labor Board v. Denver Bldg. Council,* supra; *Joliet Contractors Ass'n v. National Labor Relations Bd.,* 193 F. 2d 833; *McAllister Transfer, Inc.,* 110 NLRB 1769 (1954), CCH Lab. Law Rep. ¶ 52,513; *Sand Door and Plywood Co.,* 113 NLRB 1210 (1955), CCH Lab. Law Rep. ¶ 53,166). Had the general contractors and owners of construction projects refused to accede to defendants' demands, union employees who struck their employment would not have returned to work and those who threatened to do so, would have stopped work. Substantial construction work would have immediately ceased which might well have resulted in a decrease in the inflow of building materals and supplies from out-of-state manufacturers to local retailers and thence to the general contractors affected. The testimony concerning the dollar volume of business done by the general contractors and other business concerns showed that the general contractors performed construction services valued at several million dollars annually and that they purchased materials and supplies amounting to hundreds of thousands of dollars which indirectly crossed state lines and, in addition, made direct purchases of over $76,000 in interstate commerce. We think the record fairly presents that a business such as plaintiff's, although concededly local in character, cannot be considered as totally unconnected with interstate commerce, at least in a setting of a secondary boycott as here presented. Furthermore, it is credible that defendants' activities, if "left unchecked," would affect and burden interstate commerce in the truest sense of the word.

Moreover, decisions of federal courts universally hold that an employer may be subject to Taft-Hartley although not himself engaged in interstate commerce, where strikes and labor disputes necessarily result in the cessation of the movement of products and materials in interstate commerce (*Labor Board v. Fainblatt,* supra; *Labor Board v. Jones & Laughlin Steel Corp.,* supra; *Labor Board v. Freuhauf Co.,* 301 U. S. 49, 81 L. Ed. 918, 57 S. Ct. 642, 108 A. L. R. 1372; *Labor Board v. Clothing Co.,* 301 U. S. 58, 81 L. Ed. 921, 57 S. Ct. 645, 108 A. L. R. 1375; *Santa Cruz Co. v. Labor Board,* 303 U. S. 453, 463, *et seq.,* 82 L. Ed. 954, 58 S. Ct. 656; *Joliet Contractors Ass'n v. National Labor Relations Bd.,* supra). Nor do we think it important, as plaintiff contends, that the volume of inter-

state business affected by defendants' prohibited activities, though substantial, was relatively small as compared with that of cases before the National Labor Relations Board involving large interstate concerns. Furthermore, the maxim *de minimis non curat lex* does not require that the National Labor Relations Board refuse to take jurisdiction of the instant case (*Labor Board v. Denver Bldg. Council*, supra; *Joliet Contractors Ass'n v. National Labor Relations Bd.*, supra). As stated by Mr. Justice Jackson in *U. S. v. Women's Sportswear Assn.*, 336 U. S. 460, 464, 93 L. Ed. 805, 69 S. Ct. 714,

". . . The source of the restraint may be intrastate, as the making of a contract or combination usually is; the application of the restraint may be intrastate, as it often is; but neither matters if the necessary effect is to stifle or restrain commerce among the states. *If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze.*" (Emphasis supplied.)

What effect did it have on this controversy that defendants' ultimate purpose was to wrest from plaintiff, or destroy its business, an all-union agreement requiring membership in a labor organization as a condition of continued employment (G. S. 1955 Supp. 44-802 [5]), regardless of the wishes of, or an election conducted among, plaintiff's employees, in violation of G. S. 1955 Supp. 44-809 (4)? This states plaintiff's second jurisdictional contention.

Plaintiff asserts the district court had jurisdiction to issue the injunction and argues that Congress, by the enactment of § 14 (b) (29 U. S. C. A. § 164 [b]), granted the states power to prohibit or regulate compulsory union agreements, or to restate the contention, immunized against federal jurisdiction in that area, and as a result, states are free to impose their own more restrictive policies affecting union security agreements; that as a necessary incident to the full exercise of that power, states may enjoin conduct directed toward the illegal *execution* or application of such agreements in violation of state law; and, that § 14 (b) is the express declaration of Congress that nothing contained in other provisions of Taft-Hartley shall prevent the states from fully asserting the power granted them by that section. Further, that although defendants engaged in conduct definable as unfair labor practices under § 8 (29 U. S. C. A. § 158), the picketing and threats were directed toward the ultimate purpose of securing the *execution* of an all-union agreement in violation of G. S. 1955 Supp. 44-809 (4) and since, under § 14 (b), Kansas was granted jurisdiction to restrain conduct surrounding such illegal

purpose, the federal board did not have exclusive jurisdiction of the matter; consequently, no question of cession under § 10 (a) (29 U. S. C. A. § 160 [a]) arose, and the district court had jurisdiction to issue the injunction. Plaintiff cites and principally relies upon *Algoma Plywood Co. v. Wis. Board,* 336 U. S. 301, 93 L. Ed. 691, 69 S. Ct. 584 in support of its contention.

It would appear there is substantial merit in plaintiff's assertion were it not for the decisions of the Supreme Court of the United States in *Meat Cutters v. Fairlawn Meats,* 353 U. S. 20, 1 L. Ed. 2d 613, 77 S. Ct. 604; *San Diego Unions v. Garmon,* 353 U. S. 26, 1 L. Ed. 2d 618, 77 S. Ct. 607, and *Electrical Workers Local Union v. Farnsworth & Chambers Co.,* 353 U. S. 969, 1 L. Ed. 2d 1133, 77 S. Ct. 1056, which hold in effect that conduct of a labor organization not representing a majority of his employees to compel an employer to agree to a union shop contract, is conduct of which Taft-Hartley takes hold, and that a state cannot afford a remedy parallel to the provisions in that act. As we read those opinions they do not reflect to what extent consideration was given, if any, to the effect of § 14 (b), particularly since that section was not referred to in any of them.

Section 14 (b) reads:

*"Nothing in this subchapter shall be construed* as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law." (Emphasis supplied.)

The record before us indicates that the defendants' activities were directed toward the ultimate purpose of securing the *execution* of an all-union agreement in violation of G. S. 1955 Supp. 44-802 (5), 44-809 (4), and that such conduct was definable as an unfair labor practice affecting commerce under Taft-Hartley.

The opinions above referred to, particularly Fairlawn, *supra,* require us to hold that a district court lacks jurisdiction to enjoin conduct of a labor union directed toward the ultimate purpose of compelling an employer engaged in interstate commerce to enter into an all-union agreement in violation of G. S. 1955 Supp. 44-802 (5), 44-809 (4) when such conduct constitutes unfair labor practices under § 8 (b) (29 U. S. C. A. § 158 [b] [2], [4] [A]) absent a cession agreement with the National Labor Relations Board pursuant to the proviso to § 10 (a) (29 U. S. C. A. § 160 [a]).

Plaintiff's third jurisdictional point is that it would have been futile for it to apply to the National Labor Relations Board when

that board obviously would have declined jurisdiction under its announced standards; consequently, the district court was "reinvested" with jurisdiction to issue the injunction. This contention lacks merit.

Beginning with *Guss v. Utah Labor Board,* supra, and followed by *Meat Cutters v. Fairlawn Meats,* supra, and *San Diego Unions v. Garmon,* supra, the Supreme Court has held that even though it is obvious the National Labor Relations Board would decline jurisdiction of a labor controversy pursuant to its jurisdictional standards, or that it has actually done so, a state court lacks power to enjoin a labor union, not representing a majority of the employees, from exerting pressure upon an employer engaged in interstate commerce to compel him to recognize it as the bargaining agent of the employees and to enter into a union shop agreement. In arriving at that holding, the Supreme Court concluded that Congress, by the enactment of Taft-Hartley, intended to minimize the obstructions to interstate commerce created by industrial strife, and dispel the confusion resulting from dispersion of authority; that Congress established a single, paramount administrative or *quasi* judicial board and granted it comprehensive power to remedy activities defined as unfair labor practices. Further, that § 10 (a) (29 U. S. C. A. § 160 [a]) is the only means by which the National Labor Relations Board may cede jurisdiction to state authority over any case in any industry, and in the absence of such an agreement, notwithstanding a declination of jurisdiction by the federal board, state labor agencies and state courts are without jurisdiction to invoke remedies provided by Taft-Hartley or state law.

We do not assume that had this controversy been submitted to it, the National Labor Relations Board would have declined jurisdiction in view of the presence of the secondary boycott (29 U. S. C. A. § 160 [1]), although, if its decision was made pursuant to its announced jurisdiction policies, it would obviously have declined jurisdiction. Be that as it may, it is clear that the district court did not have jurisdiction to issue the injunction in either event. (*Guss v. Utah Labor Board,* supra; *Meat Cutters v. Fairlawn Meats,* supra; *San Diego Unions v. Garmon,* supra.)

Notwithstanding the presence of great degrees of local concern in this controversy, there was substantial evidence to support the finding that the issues affected interstate commerce, and we con-

clude, as previously indicated, defendants' activities constituted unfair labor practices under § 8 (b) (29 U. S. C. A. § 158 [b] [2], [4] [A]), and that the National Labor Relations Board had exclusive primary jurisdiction to prevent their continuation; hence, the district court lacked jurisdiction to issue the injunction, particularly since plaintiff itself alleged unfair labor practices affecting interstate commerce.

The judgment is affirmed.

FATZER, J., concurring: I am in accord with the majority opinion that the judgment of the district court must be affirmed, particularly that portion dealing with plaintiff's second jurisdictional contention based on the holdings in *Meat Cutters v. Fairlawn Meats*, 353 U. S. 20, 1 L. Ed. 2d 613, 77 S. Ct. 604; *San Diego Unions v. Garmon*, 353 U. S. 26, 1 L. Ed. 2d 618, 77 S. Ct. 607, and *Electrical Workers Local Union v. Farnsworth & Chambers Co.*, 353 U. S. 969, 1 L. Ed. 2d 1133, 77 S. Ct. 1056, and more particularly Fairlawn and Farnsworth. We are bound by those decisions and are required to apply their holding to the facts of the instant case. However, I believe more extensive comment should be made with respect to § 14 (b) than that contained in the majority opinion; hence, this concurring opinion.

In my judgment the Supreme Court failed in Fairlawn and Farnsworth to give due consideration to the express provisions of § 14 (b), since that statute was not mentioned or referred to in those opinions, and, as a result, the court has unduly construed Taft-Hartley in favor of a policy of requiring total uniformity of administration of that act by the federal board, contrary to the express intention of Congress.

To demonstrate my point of view, a brief résumé of those decisions is in order. Fairlawn reversed the Supreme Court of Ohio (164 Ohio St. 285, 130 N. E. 2d 237) holding that conduct of a labor organization not representing a majority of his employees, to compel an employer to enter into a union shop contract, is conduct of which Taft-Hartley takes hold, and that "*Garner v. Teamsters Union,* supra, teaches that in such circumstances a state cannot afford a remedy parallel to that provided by the act." Garmon reversed the Supreme Court of California (45 Cal. 2d 657, 291 P. 2d 1) against the claim that conduct of a labor organization directed toward the same objective as that in Fairlawn, violated § 8 (a) (3)

of Taft-Hartley and was, therefore, not privileged in the state of California. The claim of state jurisdiction in that case did not involve, as does the instant case, state laws regulating union security agreements. The Supreme Court held that what was said in Fairlawn was applicable and controlled Garmon in its major aspects. The decision appears to be correct since the employer relied upon violation of § 8 (a) (3) (29 U. S. C. A. § 158 . [a] [3] ) regulating union shop agreements and not upon a remedy under § 14 (b). Farnsworth reversed the Supreme Court of Tennessee (_____ Tenn. _____; 299 S. W. 2d 8) in a *per curiam* opinion citing only *Garner v. Teamsters Union*, 346 U. S. 485, 98 L. Ed. 228, 74 S. Ct. 161 and *Weber v. Anheuser-Busch, Inc.*, 348 U. S. 468, 99 L. Ed. 546, 75 S. Ct. 480, where the claim was made by an interstate employer that peaceful picketing either prohibited or protected by Taft-Hartley, was in violation of the state's right-to-work statute (25 *Law Week*, 3309 "Labor"), and hence, subject to state jurisdiction. The reversal apparently means that conduct directed toward the ultimate purpose of securing a union shop agreement violative of state law is subject to no remedy under § 14 (b).

It is toward those decisions and the application of the policy of total uniformity that I direct these remarks. In doing so I do not wish to be intransigent, nor participate in any popular hue and cry against a course of settled decisions, nor give any comfort to the fallacy of interposition; I agreeably accept decisions of the Supreme Court manifesting an obvious purpose of securing uniformity in the administration of national labor relations, but I should prefer to understand the rationale of the Supreme Court's limitation of § 14 (b). Without this understanding, it is a burdensome task thrust upon a judge of a state court by the supremacy clause to apply the laws of the United States in matters relating to the adjustment of federal-state relations. Perhaps this misunderstanding arises from the Supreme Court's failure to apply the principle, paraphrased from Mr. Justice Frankfurter, that Congress needs no help from generous judicial implications to achieve the supersession of state authority because it can speak with drastic clarity whenever it chooses to assure full federal authority and completely displace state power. Section 14 (b) reads:

"*Nothing in this subchapter shall be construed* as authorizing the .execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law." (Emphasis supplied.)

It is clear to me the evident purpose of that statute was to permit the states to prohibit or regulate the *execution or application* of union security agreements and to immunize against federal jurisdiction in that area of national labor relations, except as provided by § 8 (a) (3) (29 U. S. C. A. § 158 [a] [3]) hereafter referred to. The express provisions of § 14 (b) negate the assertion that this power was not fully returned to the states by Taft-Hartley. Indeed, the congressional declaration that *"Nothing in this subchapter shall be construed"* to authorize the *"execution or application"* of union security agreements prohibited by state law, precludes any other interpretation. This is the obvious inference to be drawn from the language of that section, and the legislative history confirms that construction (93 Cong Rec 6383, -84, 6446; HR Cong Rep No. 510, 80th Cong 1st Sess p. 60; HR Rep No. 245, 80th Cong 1st Sess p. 44). The following is from the Conference Committee Report of the House and Senate, *supra:*

"Under the House bill there was included a new section 13 of the National Labor Relations Act to assure that *nothing in the act was to be construed* as authorizing any closed shop, union shop, maintenance of membership, or other form of compulsory unionism agreement in any State *where the execution of such agreement would be contrary to State law.* . . . The conference agreement, in section 14 (b), contains a provision having the same effect." (Emphasis supplied.)

In *Algoma Plywood Co. v. Wis. Board,* 336 U. S. 301, 93 L. Ed. 691, 69 S. Ct. 584, cited by plaintiff, the Supreme Court held that where a state law is more restrictive than Taft-Hartley with respect to union security agreements, a state may, under § 14 (b), assume jurisdiction of a controversy affecting interstate commerce and enforce its policies without a cession agreement with the National Labor Relations Board under § 10 (a) (29 U. S. C. A. § 160 [a]). That case had to do with the *"application"* of a union security agreement in violation of a Wisconsin statute making it an unfair labor practice for an employer to enter into a union security agreement unless at least two-thirds of the employees to be affected voted affirmatively by secret ballot. An election was not held in the employer's plant. Unlike the instant case, *conduct definable as an unfair labor practice by* § 8 (29 U. S. C. A. § 158) *was not involved* since the union security agreement was in effect when that controversy arose. But in concluding that the agreement was unenforceable, the court said:

". . . the express disclaimer in § 8 (3) of the National Labor Relations

Act (the Wagner Act) of intention to interfere with State law and the permission granted the States by § 14 (b) of the Taft-Hartley Act to carry out policies inconsistent with the Taft-Hartley Act itself, would be practically meaningless if so easily avoided. For these provisions can have application, obviously, only where State and federal power are concurrent; it would have been futile to disclaim the assertion of federal policy over areas which the commerce power does not reach."

Union security agreements are regulated by § 8 (a) (3) (29 U. S. C. A. § 158 [a] [3] of Taft-Hartley. That section prohibits the closed shop and prescribes conditions under which a union shop may be entered, and, as stated in Algoma, *supra*, "§ 14 (b), 29 U. S. C. A. § 164 (b), 9 FCA title 29, § 164 (b) was included to forestall the inference that federal policy was to be exclusive." As I interpret that decision, state power to prohibit union security agreements includes power to regulate their execution or application. Writers on this subject assert that 14 (b) permits state regulation of union security agreements, including their total prohibition, notwithstanding that they affect interstate commerce and that the factual plexus involves federal power under § 8 (a) (3). In 1 *Wayne Law Review*, p. 167, it was said:

"Although the LMRA does not prohibit all forms of union security, Section 14 (b) provides that more stringent state provisions shall be controlling even in interstate commerce. Section 14 (b) reads: (Section set forth.)

"The United States Supreme Court has ruled that where the state law is more restrictive than the LMRA, the state labor relations agency can take cases affecting interstate commerce without making a cession agreement with the National Labor Relations Board. Section 10 (a) of the LMRA requires such agreements before states may assume jurisdiction in industries affecting interstate commerce.

"Repeal of Section 14 (b) would prevent the application of state Right-to-Work acts (also, such regulatory laws as G. S. 1955 Supp. 44-802 [5], 44-809 [4]) to interstate commerce and greatly reduce the effectiveness of the state laws. This is why much union effort to eliminate these laws or to limit their effectiveness is concentrated at the federal level. In its resolution of opposition to these acts, the 1954 American Federation of Labor convention, for example, created machinery to induce Congress to repeal Section 14 (b). The CIO, for the same reason, devoted a portion of its recent study on these laws to Section 14 (b) and to reasons for its appeal."

In the area of union security agreements, state and federal power is concurrent, but § 14 (b) permits state power to extend beyond § 8 (a) (3), or to restate the assertion, it immunizes against federal jurisdiction beyond the frontier of § 8 (a) (3), and a state has a free rein to adopt its own more restrictive policies in union security

agreements including their total prohibition. When having done so, *"Nothing in this subchapter shall be construed"* to authorize the execution or application of such agreements in violation of state law.

Implicit in § 14 (b) is the implication that all proper and necessary means to effectuate its purpose accompany the express power granted. The power of a state to prohibit or regulate the execution or application of union security agreements includes, therefore, the power to prevent their execution or application in violation of state law, notwithstanding that in all other matters, national labor relations are within federal jurisdiction. It is an unwarranted conclusion, denying the effect of § 14 (b), which permits the states to regulate or prohibit on the one hand, and denies enforcement of such regulations or prohibitions on the other. Nor is it necessary that cession be made under § 10 (a) to grant jurisdiction to the states for this purpose.

In *Guss v. Utah Labor Board,* 353 U. S. 1, 1 L. Ed. 2d 601, 77 S. Ct. 598, it was said:

". . . the proviso to § 10 (a) is the exclusive means whereby States may be enabled to act concerning the matters which Congress has entrusted to the National Labor Relations Board. . . ."

Whether the power of a state to adopt union security regulations is considered as a direct grant from Congress, or whether it be said that state power is immunized by § 14 (b) against federal jurisdiction, the result is the same, and state power, in either event, finds its source in Taft-Hartley in § 14 (b). *In this area the state acts under the auspices of federal power, and not, as in Weber v. Anheuser-Busch, Inc.,* 348 U. S. 468, 99 L. Ed. 546, 75 S. Ct. 480 and in Garner, *supra, by attempting to pit state jurisdiction against federal pre-empted jurisdiction.* In this area a cession agreement becomes unnecessary since the federal board had nothing to grant. It is conceded that if jurisdiction is ceded by the federal board to state agencies, state laws dealing with labor relations may then be applied. No valid distinction may be made between jurisdiction granted to the states under § 14 (b) and that ceded a state agency by the federal board under the proviso of § 10 (a)—the result is the same. The source of jurisdiction in both instances stems from Congress through Taft-Hartley; one is given directly by § 14 (b) and the other indirectly by the federal board. Indeed, the immunization against federal jurisdiction by § 14 (b) requiring no implementation, should be given more status, if distinction be made.

Defendants assert that because their conduct is definable as an unfair labor practice by § 8, it is remedial only by the federal board. Although that board is granted plenary jurisdiction over unfair labor practices (§ 10 [a]), defendants' contention overlooks the fact that conduct, which might otherwise be defined as an unfair labor practice by § 8, is immunized against federal jurisdiction by § 14 (b). Congress has provided that state jurisdiction shall not cease at the threshold of conduct definable as an unfair labor practice. Sec. 14 (b) grants to the states power to regulate the "execution or application" of union security agreements, or, if the terminology is preferred, it immunizes against federal jurisdiction in that area; but however characterized, it is more plenary in its field of operation than power granted the federal board by § 10 (a), since § 14 (b) provides that *Nothing in this subchapter shall be construed*" to authorize the execution or application of union security agreements in violation of state law. Indeed, when § 14 (b) is paraphrased it provides that "Nothing contained in § 10 (a)" or "Nothing contained in § 8," defining unfair labor practices, shall be construed, etc. Nullification of § 14 (b) results if § 8 is permitted to control its application with respect to conduct directed ultimately toward the execution of union security agreements in violation of state law. This conclusion necessarily follows since, as a practical matter, conduct surrounding the "execution" of an illegal union security agreement is, in the main, conduct otherwise definable as an "unfair labor practice," "affecting commerce" within the extensive scope of those terms. Furthermore, the assertion that state power does not extend to prohibit conduct surrounding an attempt to procure an illegal union security agreement denies credence to the language of § 14 (b), and is contrary to its express purpose. (See Legislative history, *supra.*) To limit the construction of the term "execution" as used in that section merely to the flourishing of a pen in the signing of a union security agreement procured by illegal conduct is unwarranted, since, in my judgment, coercive conduct directed toward the ultimate purpose of compelling an employer to execute a union security agreement in violation of state law, is conduct over which § 14 (b) empowers states to control, or, if the term is otherwise preferred, immunizes against federal jurisdiction. To require the states to await the perpetration of a union security agreement in violation of their laws and to deny to them power to prevent con-

duct surrounding that perpetration, defeats the express and deliberate intent of Congress to confer state jurisdiction.

I would not follow the false trail leading to the conclusion that § 8 with § 10 (a) is contradictory to § 14 (b), so that one must yield to the other. It is a cardinal rule of construction that all statutes are to be construed so as to sustain them and give them a field of operation rather than ignore or defeat them, if the language will permit, instead of treating them as meaningless. (2 Lewis' Sutherland on Statutory Construction, § 498). It is evident that neither statute is meaningless, nor were they so intended by Congress. Each has been given a field of operation; §§ 8 and 10 (a) prevent unfair labor practices affecting commerce except as § 14 (b) withdraws federal jurisdiction over conduct directed toward the ultimate purpose of securing an illegal all-union agreement, which conduct § 14 (b) permits the states through their courts to enjoin when carried on in violation of state laws. It is unreasonable to assume that Congress, having immunized again the exclusive jurisdiction of §§ 8 and 10 (a), *i. e., "Nothing in this subchapter shall be construed,"* would contemplate that the remedy authorized by § 14 (b) should be construed to a nullity. (*State of Maryland v. United States,* 165 F. 2d 869, 872, 873; Sutherland, Statutory Construction, Vol. 3, § 5402, pp. 19, 20.)

Under Fairlawn, Garmon and Farnsworth, *supra,* the Supreme Court apparently permits the federal board to follow the illegal conduct into the area immunized against federal jurisdiction, lay hold of it, and bring it before the federal board for adjustment and prevention. The effect of this is to preclude state power from operating to its legitimate end—empowering it to regulate union security agreements, but denying enforcement of its regulations. The federal board is not concerned with the texture of a state law nor with its enforcement; thus, the use of § 8 to withdraw from state power the enforcement of those regulatory measures with respect to the illegal execution of union security agreements, permits the execution of such agreements in violation of state law, particularly so in those instances where jurisdiction is declined by the federal board. The result is to leave the injured party remediless. The unrestrained conduct is permitted to achieve its illegal end, *i. e.,* the execution of a union security agreement in violation of state law.

I am aware that the foregoing construction of Taft-Hartley would

vest in state agencies and state courts a measureable authority; but I believe it consistent with the express language of Taft-Hartley that § 14 (b) was a deliberate concession to the states to share the burden of the amicable adjustment of labor relations which is equally the concern of the states as well as the federal government. (See reference to Legislative history.) Although some courts may erroneously characterize conduct as directed toward the *ultimate purpose* of securing an illegal union security agreement, thus empowering them to lay hold of the conduct, I believe the following language of the Supreme Court in *Clothing Workers v. Richmond Bros.*, 348 U. S. 511, 99 L. Ed. 600, 75 S. Ct. 452, 457, is apropos:

"We cannot assume that this confidence (in state courts) has been misplaced. Neither the course of this case, nor the history of state court actions since the decision in *Garner v. Teamsters Union*, 346 U. S. 485, demonstrates recalcitrance on the part of state courts to recognize the rather subtle line of demarcation between exclusive federal and allowable state jurisdiction over labor problems."

This expression of confidence in state courts is justified. The Supreme Court would be no more flooded with litigation to correct contended willful misapplications of the ultimate purpose doctrine, as here stated, than it would be under the rule of *Teamsters Union v. Vogt, Inc.*, 354 U. S. 284, 1 L. Ed. 2d 1347, 77 S. Ct. 1166, which permits the enjoining of peaceful picketing in a given situation under the "substantial purpose" doctrine as there announced.

I conclude these remarks with the statement that, under the rule announced in Fairlawn, Garmon and Farnsworth, labor organizations, employees and employers are required to wander in the semidarkness of federal jurisdiction barring state power, not by federal action, but by federal inaction. The light of state jurisdiction, illuminated by § 14 (b), has been dimmed and states may no longer look to that section as a federal authorization to enjoin conduct directed toward the execution of union security agreements in violation of their laws, which conduct is definable as an unfair labor practice under § 8. It is in the semidarkness of these precedents that I affirm the judgment of the district court.

WERTZ, J., concurs in the foregoing concurring opinion.